[No. F017527. Fifth Dist. June 1, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMUEL LEE SHOEMAKE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

## COUNSEL

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Margaret Garnand Venturi and Mary Jane Hamilton, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, J.**—On August 23, 1991, an information was filed in Kern County Superior Court charging appellant Samuel Lee Shoemake with two counts of forcible sodomy in violation of Penal Code section 286, subdivision (c), one count of forcible oral copulation in violation of Penal Code section 288a, subdivision (c), and one count of rape by means of force in violation of Penal Code section 261, subdivision (a)(2).[1] Both the rape and sodomy were alleged to be serious felonies within the meaning of section 1192.7, subdivision (c)(3)-(4). It was also alleged, as to each count, that appellant had committed each offense with knowledge that he had acquired immune deficiency syndrome (AIDS) or knowledge that he carried antibodies of the human immunodeficiency virus (HIV) in violation of section 12022.85. It was further alleged that appellant had previously been convicted of two counts of forcible rape and that he had not remained free from prison

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

custody for a period of ten years thereby giving rise to four enhancements under section 667.6, subdivision (b). The information also alleged that appellant kidnapped the victim for the purpose of committing the above referenced sexual offenses thereby giving rise to four enhancements under section 667.8, subdivision (a). Finally, it was alleged that appellant had previously been convicted of a serious felony, to wit: assault with a deadly weapon in violation of section 245, subdivision (a) thereby giving rise to four enhancements under section 667, subdivision (a). Appellant entered a plea of not guilty to all charges and denied each of the allegations.[2]

On October 25, 1991, the trial court denied appellant's motion for change of venue. The court did, however, grant appellant's section 1538.5 motion to suppress and ordered that the fruits of appellant's warrantless arrest be suppressed (i.e., his clothing, statements, and blood sample).

The matter proceeded to trial on November 21, 1991. A mistrial was subsequently declared because three jurors read a newspaper article over the weekend that contained evidence regarding an issue that had been ordered bifurcated from the guilt phase of the trial (i.e., the AIDS enhancement).

Jury selection started anew the same day. On December 3, 1991, after only two days of deliberation, a mistrial was declared because the jury was unable to reach a verdict. Appellant moved for dismissal, but the trial court denied the motion.

The third jury trial began on January 23, 1992. During voir dire, a total of 12 venire persons were excused for cause. Of these venire persons, one was an African-American male; the other was an African-American female. The only remaining African-American venire person, a male, was excused after the prosecutor exercised one of his peremptory challenges. Appellant immediately filed a *Wheeler* motion.[3] The court heard and denied his motion outside the presence of the jury because, in its opinion, appellant failed to make a prima facie showing of "systematic exclusion" of African-Americans from the venire. The prosecutor brought a *Wheeler* motion challenging appellant's removal of female venire persons. This motion was denied as well.

At the close of the People's case, appellant brought a section 1118.1 motion for entry of judgment of acquittal based on insufficient evidence of

---

[2]The clerk's transcript on appeal does not contain any information regarding appellant's arraignment. However, his entry of such a plea can be inferred from the fact that the jury was asked to determine each of these issues.

[3]*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. For purposes of this motion, it should be noted that both appellant and the victim are African-Americans.

guilt. The court found that there existed a "plethora" of evidence which, if believed, would support the charges and accordingly, denied the motion.

The case went to the jury and, on February 4, 1992, they found appellant guilty on all four counts. The jury also found the kidnapping enhancement under section 667.8, subdivision (a) to be true.

The bifurcated portion of the trial began on February 5, 1992. The following day, appellant unsuccessfully moved to have the AIDS allegation (§ 12022.85) stricken. Later that day, after a few hours of deliberations, the jury found the AIDS allegation to be true. They also found true the section 667, subdivision (a) and section 667.6, subdivision (b) allegations.

On March 12, 1992, the trial court denied appellant's motion for a new trial. Probation was denied and appellant was sentenced to state prison for a total of 72 years less appropriate time credits.

Appellant timely filed his notice of appeal on March 17, 1992. Appellant presents four arguments on appeal. First, he claims the trial court erred when it denied his *Wheeler* motion.[4] Second, he maintains that, as a matter of public policy, this court should find that the "corpus rule" applies to section 12022.85 status enhancements. Third, appellant insists that some of the evidence relied upon by the prosecution to prove the AIDS allegation should have been excluded because it was inadmissible hearsay. Finally, irrespective of the court's conclusion regarding the two prior arguments presented, appellant claims that insufficient evidence exists to support the AIDS enhancement.

FACTS

At approximately 8:30 p.m. on July 28, 1991, Estella O.[5] was visiting with her boyfriend and some teenagers. She consumed three beers and had one "hit" of rock cocaine over the course of the evening. Shortly before 1 a.m., the victim got into a fight with her boyfriend after which she decided to go to an after-hours club by herself.

Meanwhile, appellant and Ms. Howard, appellant's live-in girlfriend, had been drinking at the Cotton Club and around 1:15 a.m. on July 28, 1991, appellant brought Ms. Howard home because she was feeling nauseated. He then returned to the club using her vehicle.

---

[4]In the unpublished portion of this opinion, we conclude there is no basis for reversal for *Wheeler* error.

[5]Hereinafter referred to as "the victim."

About this same time, the victim saw appellant, one of her brother's high school classmates, and asked him to give her a ride to the Cowboy Club. He agreed.

Initially, appellant drove in the direction of the club. After some friendly conversation, the victim said that appellant began to look funny and that she became scared. She asked him if he was going to hurt her and he responded, in part, by punching her in the left eye.

Appellant did not take the victim to the club as promised, but instead took her, against her will, to Casa Loma Park. After parking the car, appellant got out and urinated. He then came around to the passenger side of the vehicle and ordered the victim to get out of the car. He pulled her out of the car and struck her again in the face. When she began yelling, he told her to "shut the fuck up."

After forcing the victim into position, appellant proceeded to sodomize her. He then turned her around, struck her on the right side of her face, and forced her to orally copulate him. After a few minutes, appellant repositioned the victim, and struck her again. When she opened her eyes, the victim realized that appellant had backed away from her and had his eyes closed so she tried to escape.

She began running, but tripped over a sprinkler. Appellant caught up with her, pulled her off the wet grass, and dragged her back to the passenger side of the vehicle. He hit her and continued to tell her to "shut the fuck up."

Appellant then turned the victim around and sodomized her for a second time. The victim said she believes this second act of sodomy caused her to defecate. She also said that she bled anally although she could not say when the bleeding actually began.

Still dizzy from the multiple blows, the victim tried to hug appellant and ask him why he was doing this to her. Whereupon, he pushed her back into the car and proceeded to rape her. After a short time, he withdrew his penis, pulled her out of the car, and struck her. As before, appellant closed his eyes and backed away ever so slightly. Having noticed that he was temporarily distracted, the victim took advantage of the situation and fled the area of the assault.

She managed to reach a nearby house and began pounding on the front and then the rear door. She was crying hysterically and pleading with the occupants of the house to let her inside. Due to her appearance, they would not let her inside but did telephone the police.

Patrol deputies with the Kern County Sheriff's Department arrived on the scene around 2 a.m.[6] Detective Giuffre arrived a short time later and took over the investigation of the case.

When he first made contact with the victim, he noticed that her face was swollen as if she had been in some sort of altercation. He also noticed that the back of the victim's dress was stained with blood and fecal matter. The victim was hysterical, angry, and crying. She did not appear to be under the influence of crack cocaine. After obtaining a brief statement at the scene, Detective Giuffre accompanied the victim to Kern County Medical Center (KMC) so that a sexual assault examination could be performed. He also arranged for photographs of the victim to be taken while at KMC.

The sexual assault examination was performed by Ms. Molhook, a registered nurse who had received specialized training in the methods used to gather physical evidence in sexual assault cases. During the examination, the victim complained of pain emanating from her forehead, nose, collarbone, chin, and top of her head. She also complained of extreme tenderness during the rectal examination. Physical examination revealed a lacerated chin, scratches under the left eye, ecchymotic[7] areas on the inside of both cheeks, petechiae[8] on the inside of the left cheek, nonmotile sperm in the vaginal "vault," fecal material on the right buttock, and a raised and abraised portion of the anus. The nurse did not find any evidence of rectal bleeding. Woods lamp examination[9] revealed areas of fluorescence on the victim's cheeks and inner thighs. The nurse collected the samples necessary to complete the rape kit and turned them over to the appropriate law enforcement agency.

Meanwhile, Detective Giuffre returned to the scene where the incident was alleged to have occurred. He was unable to find any physical evidence that would assist him in his investigation.

Diane Woods, an evidence technician, examined the suspect vehicle around noon the same day, July 28, 1991, but did not find any evidence that could confirm that the claimed assault took place in or on the vehicle.

At trial, Kern County Regional Crime Lab criminalist Jeanne Spencer testified about the results obtained after miscellaneous tests were performed

---

[6]Ms. Howard indicated that appellant returned home at approximately 2 a.m.

[7]Relating to "[a] purplish patch caused by extravasation of blood into the skin . . . ." (Stedman's Medical Dict. (25th ed. 1990) p. 484.)

[8]"[M]inute hemorrhagic spots, of pinpoint to pinhead size, in the skin . . . ." (Stedman's, *supra*, at p. 1174.) According to the nurse conducting the examination, petechiae can by caused by friction.

[9]A Woods lamp is used to illuminate parts of the body where, based on the patient's history, saliva or semen is expected to be found. The area will flouresce if these bodily secretions are actually present.

on the rape kit samples. She indicated that fecal matter was found on the victim's dress and in her panties. Through testing, Miss Spencer discovered that the victim had type O blood while appellant had type B. They were both found to be secretors,[10] but differed in three of their blood enzymes.

Based on her findings, the criminalist was able to conclude that appellant could have been the donor of the secretions found in the victim's vagina as well as those found on her thighs and the crotch of her underwear. The vaginal and inner thigh swabs produced secretions consistent with appellant's type of blood (i.e., type B). The criminalist explained that approximately 20 percent of all African-American persons have type B blood.[11] Based on her examination of the semen found in the victim's underwear, the criminalist determined that the donor had type B blood and further, that the donor came from one of three phosphoglucomutase (PGM) types: one plus one minus, two plus one minus, and one minus one plus. Individuals, such as appellant, with type B blood and a PGM type of one plus one minus make up only 3.5 percent of the African-American population.[12] Whereas those with type B blood and a PGM type of two plus one minus comprise only .7 percent of the African-American population. Finally, those with type B blood and a PGM type of one minus one minus equal 4 percent of the population. Examination of the slides prepared using the oral and anal swabs failed to reveal the presence of sperm.

During the bifurcated portion of the trial, Ms. Howard testified that, a few days before July 4, 1991, appellant informed her that he was "HIV positive," while Mr. Bracamonte, appellant's parole officer, testified that appellant admitted having AIDS as early as May 15, 1991.

*Defense*

Appellant did not testify during trial. A toxicologist for the defense testified that even small amounts of cocaine, such as that admittedly consumed by the victim in this case, can, in some cases, lead to psychotic

---

[10]"A secretor is a person who secretes his or her blood group substances in other body fluids such as saliva [or] semen."

[11]The criminalist also testified to the frequency of occurrence of this blood type within the Caucasian and Hispanic populations.

[12]As before, the criminalist did not limit her testimony to the ratio of occurrence of this blood type within the African-American population.

behavior, although he also testified that cocaine would usually give one a feeling of euphoria.

*Rebuttal*

A criminalist and an undercover deputy who specializes in rock cocaine usage both testified that cocaine use does not produce psychosis.

DISCUSSION

I*

*Wheeler Error*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

*Corpus Delicti Rule Does Not Apply to Section 12022.85*
*Sentence Enhancements*

 In this case of first impression, appellant asks us to find the corpus delicti rule applicable to section 12022.85[15] sentence enhancements and further that the rule, as applied to this case, required the prosecutor to prove, independent of appellant's statements, that appellant *actually had* AIDS or was HIV positive at the time the present offenses were committed.

---

*See footnote, *ante*, page 243.

[15]Section 12022.85, in relevant part, states:

"(a) Any person who violates one or more of the offenses listed in subdivision (b) with knowledge that he . . . has acquired immune deficiency syndrome (AIDS) or with the knowledge that he . . . carries antibodies of the human immunodeficiency virus [HIV] at the time of the commission of those offenses, shall receive a three-year enhancement for each such violation in addition to the sentence provided under those sections.

"(b) Subdivision (a) applies to the following crimes:

"(1) Rape in violation of Section 261.

". . . . . . . . . . . . . . . . . . . . . . . . .

"(4) Sodomy in violation of Section 286.

"(5) Oral copulation in violation of Section 288a.

"(c) For purposes of proving the knowledge requirement of this section, the prosecuting attorney may use test results received under subdivision (c) of Section 1202.1 or subdivision (g) of Section 1202.6."

■ Where applicable, the corpus delicti[16] rule requires that "the corpus delicti must be established by the prosecution independently from the extrajudicial statements, confessions or admissions of the defendant." (*People* v. *Wright* (1990) 52 Cal.3d 367, 403 [276 Cal.Rptr. 731, 802 P.2d 221].) "[T]he corpus delicti rule is a rule of law that governs the admissibility of evidence. (*People* v. *Rogers* (1943) 22 Cal.2d 787, 806 . . . ; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 140, p. 156.)" (*People* v. *Diaz, supra,* 3 Cal.4th at p. 529.) It "operates initially to establish the foundation for admission of a defendant's extrajudicial admissions and confessions. However, once prima facie proof of the corpus delicti has been offered, and a defendant's confessions or admissions have been admitted, those statements may be considered in determining all of the elements of the charged offenses that have been established. [Citations.]" (*People* v. *Mattson* (1990) 50 Cal.3d 826, 874 [268 Cal.Rptr. 802, 789 P.2d 983].)

Traditionally, the rule has been applied to the prosecution of every crime. In addition, prior to the passage of Proposition 115, the rule was also applied to felony-murder special-circumstance allegations. (See *People* v. *Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887] [rule applicable to felony-murder special-circumstance allegations]; *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 297-298 [279 Cal.Rptr. 592, 807 P.2d 434] [rule no longer applicable to prosecutions of felony-based special-circumstance cases involving crimes committed after passage of Proposition 115].) In reaching the pre-Proposition 115 decision to apply the rule in felony-murder based special-circumstance cases, our Supreme Court "relied upon statutory language stating that such felonies must be proved 'pursuant to the general law applying to the trial and conviction of the crime.' [Citations.]" (*People* v. *Mickle* (1991) 54 Cal.3d 140, 179 [284 Cal.Rptr. 511, 814 P.2d 290].) The court noted "that section 190.4's references to 'general law' incorporate[d] the corpus delicti requirement [and construed this language] as further indication that [the underlying felony] must be proved in the same manner as if they were independent crimes." (*People* v. *Howard* (1988) 44 Cal.3d 375, 414 [243 Cal.Rptr. 842, 749 P.2d 279].) This interpretation was rejected by the electorate when, in June of 1990, they passed Proposition 115 which resulted in section 190.41[17] being added to the Penal Code. (See *Mickle, supra,* 54 Cal.3d at p. 179, fn. 22; *Tapia, supra,* 53 Cal.3d at pp. 297-298.)

---

[16]"The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm." (*People* v. *Diaz* (1992) 3 Cal.4th 495, 528 [11 Cal.Rptr. 353, 834 P.2d 1171].)

[17]Section 190.41 provides: "Notwithstanding Section 190.4 or any other provision of law, the corpus delicti of a felony-based special circumstance enumerated in paragraph (17) of subdivision (a) of Section 190.2 need not be proved independently of a defendant's extrajudicial statement."

In *People* v. *Howard, supra,* 44 Cal.3d 375, the Supreme Court addressed the applicability of the corpus delicti rule to nonfelony-based special circumstances. In *Howard,* the jury found the defendant "intentionally committed murder for financial gain, a special circumstance as set forth in section 190.2, subdivision (a)(1)." (At p. 385.) The defendant contended the only evidence that he was hired to kill came from his confession. Consequently, the defendant maintained that "because this was the only evidence of a killing for hire which provided the basis of the special circumstance finding, the corpus delicti rule should apply and require the prosecution to establish the fact of the contract to kill independently of his statements." (*Id.* at pp. 413-414, fn. omitted.) In rejecting defendant's argument, the court reviewed the application of the corpus delicti rule to felony-based special circumstances such as robbery-murder, and nonfelony-based special circumstances such as lying in wait (see *People* v. *McDermand* (1984) 162 Cal.App.3d 770 [211 Cal.Rptr. 773]). Noting that the application of the corpus delicti rule applied in *People* v. *Mattson, supra,* 37 Cal.3d at page 95 was based on the specific language of section 190.4, the court concluded "neither logic nor precedent requires its extension to special circumstances such as this one." (*Howard, supra,* 44 Cal.3d at p. 415.)

In *People* v. *Morales* (1989) 48 Cal.3d 527 [257 Cal.Rptr. 64, 770 P.2d 244], the court reached the same conclusion when the defendant argued the proof of the lying-in-wait special circumstance "was derived primarily from his own extrajudicial statements." (*People* v. *Morales, supra,* 48 Cal.3d at p. 559.)

■ Appellant distinguishes cases referring to felony-based special circumstances and special circumstances relating to the manner in which the crime was committed by categorizing section 12022.85 as a "status" enhancement. His argument equates the provisions of section 12022.85 with section 190.2, subdivision (a)(3), murder with a prior murder; section 667, subdivision (a), the "serious felony prior" five-year enhancement; and section 667.6, subdivision (a), the five-year and ten-year "prior sex offense" enhancement, etc. For the reasons stated herein, we find the distinction, if any, between "circumstances of the crime" enhancements and "status" enhancements not determinative to our resolution of the issue.

■ Initially, we note that the corpus delicti rule is neither constitutionally nor statutorily based. It is a requirement that has been imposed through judicial interpretation. (See *People* v. *Jones* (1867) 31 Cal. 565.) Essentially, it has been implemented *for the benefit of the accused* and *for the benefit of the courts* to assure reliability of the conviction of a crime. As noted in *People* v. *Manson* (1977) 71 Cal.App.3d 1, 42 [139 Cal.Rptr. 275], "[The

corpus delicti] principle is considered to be sufficient protection to guard against a defendant confessing to a crime which was never committed." Our Supreme Court addressed the issue by noting, ". . . the purpose of the corpus delicti rule is 'to protect the defendant against the possibility of fabricated testimony which might wrongfully establish the crime and the perpetrator.' [Citation.] As one court explained, 'Today's judicial retention of the rule reflects the continued fear that confessions may be the result of either improper police activity or the mental instability of the accused, and the recognition that juries are likely to accept confessions uncritically. [Citation.]" (*People* v. *Jennings* (1991) 53 Cal.3d 334, 368 [279 Cal.Rptr. 780, 807 P.2d 1009.)

Thus, what emerges from these authorities is the conclusion that the purpose of the rule is to protect the accused from his own instability or from statements which were conceivably made in response to pressure rather than guilt. ■ Which brings us to an additional observation: the term "corpus delicti" refers to "the body of a crime" (see Black's Law Dict. (5th ed. 1979) p. 310), or generally speaking, the "elements of the crime," (see 1 Witkin, Cal. Criminal Law (2d ed. 1988) § 136, p. 152). An enhancement does not define a crime but merely imposes additional punishment for a crime when certain circumstances are found to exist. (*People* v. *Best* (1983) 143 Cal.App.3d 232, 236 [191 Cal.Rptr. 614]; see e.g., *In re Culbreth* (1976) 17 Cal.3d 330, 333 [130 Cal.Rptr. 719, 551 P.2d 23] [section 12022.5 enhancement does not prescribe a new offense but merely additional punishment for an offense in which a firearm is used]; *People* v. *Strickland* (1974) 11 Cal. 3d 946, 961 [114 Cal.Rptr. 632, 523 P.2d 672] [same].) Nor does section 12022.85 require proof of any underlying crime.

Further, by its nature, an enhancement affects punishment for the underlying crime to which it is specifically or generally appended. In other words, the enhancement does not apply unless and until the guilt of the accused is resolved for the charged crime. In simple terms, we are not addressing the possibility of punishing someone innocent of any crime.

That is not to say, however, that we should not be concerned about the unjustified imposition of additional punishment through an enhancement. Rather, it is important to note a major distinction with the historical evolution of the corpus delicti rule which has been directed towards specific crimes as opposed to allegations affecting punishment.

However, we find the most compelling rationale for the inapplicability of the corpus delicti rule under these circumstances to lie in its fundamental concerns. The rule exists to protect the accused from his conceivable inability to protect himself. There is no such danger here. Assuming a "status"

enhancement carried the dangers expressed by the corpus delicti rule of the accused's own words giving rise to the accusation, the disproof of the enhancement is available to the accused through hard evidence. The defendant can easily and readily present evidence which would disprove through medical testimony the accuracy of his own words. In other words, unlike a crime where the only evidence to disavow the accuracy of his confession may well be his protestation of innocence, status enhancements are easily disproved by sources of readily verifiable and minimally disputable accuracy.

We see no social or judicial policy to be furthered by applying a rule designed to protect the accused when it is unnecessary to assure accuracy. The defendant here carries his proof within himself. Likewise, we see no inconsistency in our conclusion with the legal principle that the burden of proof should be on the accuser. The proof utilized by the state is the words of the defendant. No constitutional or statutory principle diminishes their force as evidence of the truth. The corpus delicti rule would not serve its purpose by application to section 12022.85 and we decline to find it applicable based on precedent or social policy.

## III

*Appellant Waived His Multiple Hearsay Objection by Failing to Raise It at the Time His Extrajudicial Statements Were Offered Into Evidence*

For the first time on appeal, appellant challenges the introduction of his statements, made prior to the commission of the present offenses, that he had AIDS or was a carrier of the HIV virus.[18] While he has phrased his arguments avoiding the issue of waiver, the fact remains that the position he advances on appeal comes down to whether the statements were improperly admitted into evidence.

We need not decide this question because appellant did not preserve the issue for appeal by a timely and specific objection in the trial court. (See Evid. Code, § 353 [finding shall not be set aside by reason of erroneous admission of evidence unless, inter alia, there appears of record an objection that was timely and specifically made]; *People* v. *Szeto* (1981) 29 Cal.3d 20, 32 [171 Cal.Rptr. 652, 623 P.2d 213] [waiver of hearsay objection resulted from failure to raise objection during trial].)

---

[18]Appellant made a number of motions both before and during trial, none of which concerned the introduction of any of these statements.

## IV

### Evidence Deemed Legally Sufficient to Sustain
### Section 12022.85 Sentence Enhancements

■ Appellant's final argument concerns the sufficiency of the evidence to support the true finding on each of the four section 12022.85 sentence enhancements. He does not dispute the sufficiency of the evidence as it relates to the underlying sexual offenses, but instead has focused his attention on what he perceives to be a shortfall in the evidence regarding his having committed the offenses with the knowledge that he had AIDS or was a carrier of the HIV virus. In this regard, appellant maintains that "proof of the truth of the section 12022.85 enhancement, on the basis of admissions by the defendant, should be deemed insufficient as a matter of law."[19]

■ Our function, as an appellate court, is to determine " 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' . . . '[T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt." [Citation omitted.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " [*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781].) In performing this function, we " 'must view the evidence in the light most favorable to the prosecution . . . .' " (*Ibid.*) This does not mean that we can isolate items of evidence favorable to the judgment; instead, "we must resolve the issue in light of the *whole record* — i.e., the entire picture of the defendant put before the jury . . . . [In addition,] we must judge whether the evidence of each of the essential elements . . . is *substantial* . . . .' " (*Johnson, supra,* 26 Cal.3d at p. 577, quoting *People* v. *Bassett* (1968) 69 Cal.2d 122, 138 [70 Cal.Rptr. 193, 443 P.2d 777].) "Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' [Citations.]" (*Johnson, supra,* 26 Cal.3d at p. 576.)

■ Based on our review of the record, we conclude the evidence presented was legally sufficient to support the true finding on each of the

---

[19]The People offered at the outset of the bifurcated trial on the section 12022.85 allegation, evidence from the Department of Corrections which included a laboratory report from the Solano County Health Department confirming appellant was HIV positive. This evidence was rejected for various reasons not relevant here. However, as the Attorney General acknowledges, there are significant questions concerning whether confidentiality provisions may preclude admissibility of AIDS test results when those results were not obtained pursuant to mandatory testing under section 1202.1.

section 12022.85 sentence enhancements. Appellant's statements to Ms. Howard and Mr. Bracamonte acknowledging that he either had AIDS or was HIV positive were admitted into evidence without objection or limitation. No evidence was presented in rebuttal.

Thus, a reasonable trier of fact could conclude that appellant either knew he had AIDS or was a carrier of the HIV virus at the time he committed the current offenses.

The judgment is affirmed.

Best, P. J., and Dibiaso, J., concurred.

A petition for a rehearing was denied July 1, 1993, and appellant's petition for review by the Supreme Court was denied August 26, 1993. Mosk, J., was of the opinion that the petition should be granted.