Filed 11/14/14  P. v. Ruedas CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048545 |
| v. | (Super. Ct. No. 08CF2288) |
| ALBERT LUGO RUEDAS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Albert Lugo Ruedas guilty of first degree murder and active participation in a criminal street gang and returned true findings on special circumstance allegations that he committed the murder while an active participant in a criminal street gang and while attempting to commit a robbery. In addition, the jury found defendant committed the murder for the benefit of, at the direction of, or in association with a criminal street gang, and that he personally discharged a firearm causing the victim's death. The trial court sentenced him to prison for life without the possibility of parole for the murder with an additional 25 years to life on the firearm enhancement. The court imposed, but stayed the terms for his active gang participation conviction and the gang enhancement. (Pen. Code, § 654.)

Defendant seeks reversal of his conviction on several grounds. He argues the prosecution failed to establish the corpus delicti for the charged crimes, the special circumstance allegations, and the gang enhancement. He attacks the trial court's denial of his motion to suppress his confession, plus its failure to instruct the jury on the lesser crimes of second degree murder and both voluntary and involuntary manslaughter. Next, defendant claims the prosecutor committed misconduct during closing argument. Finally, he asserts his trial counsel failed to render effective assistance. We affirm the judgment, concluding his claims either lack merit or any error was harmless.

FACTS

While driving along a Santa Ana street shortly after midnight, Jose Madrigal saw two men standing on the sidewalk wearing hooded sweatshirts with the hoods pulled over their faces. He watched as the two men ran up behind a person walking along the sidewalk, later identified as Daniel Jimenez Lopez. The man wearing a white or light-colored sweatshirt placed Lopez in a chokehold. Madrigal then heard a

2

loud noise that sounded as if something hit his car. He subsequently discovered his vehicle had been struck by a bullet.

Madrigal circled the block. He saw a beige- or khaki-colored older model Chevrolet Suburban double-parked in a shopping center with its lights off. People were sitting in the driver's and front passenger's seats and the vehicle's doors were open. The two men in hooded sweatshirts were fleeing toward the Suburban. Madrigal tried to get the Suburban's license plate number, but the vehicle sped away.

Meanwhile, Lopez called 911 and told the dispatcher he had been shot. Madrigal returned to Lopez's location, reaching it just as a police officer arrived. They found Lopez lying face down, bleeding from bullet wounds in his lower back, holding a cell phone in one hand and a box cutter in the other hand. Paramedics took Lopez to the hospital, but he succumbed to his wounds. At the scene, the police recovered shell casings for six Winchester .380 caliber bullets.

Five days later, a Fullerton police officer stopped an older model gold-colored Suburban driven by defendant. When asked if he had anything illegal in the vehicle, defendant acknowledged there was a .380 caliber handgun in the glove box. The officer retrieved the gun and found it loaded with .380 caliber Winchester bullets. Defendant was arrested and charged with carrying a loaded firearm.

Two days later, defendant was arraigned on the firearm charge. The trial court appointed a public defender to represent him. Counsel declared defendant reserved his constitutional rights and entered a not guilty plea for him. Defendant remained in custody.

After defendant's arrest, the police linked the weapon found in his vehicle to the Lopez murder. The Suburban was impounded and searched, resulting in the discovery of a light gray hooded sweatshirt and two pairs of black gloves.

On the evening of his arraignment for the firearm charge, two Santa Ana detectives met with defendant at the Orange County Sheriff's headquarters. The

3

detectives explained they wanted to question him on "a case that happened . . . in Santa Ana about a week ago." They advised defendant of his rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]) and he agreed to speak with them. The interrogation was recorded and later played for the jury.

Over the course of the questioning, defendant gave contradictory versions of what happened the night of Lopez's murder. Initially, he denied being in Santa Ana. Later, he admitted visiting friends in the city. After further questioning, defendant said he was present when a man, identified as "Jose," shot another man over a personal dispute. Then he stated, "Jose" shot the man during an attempt to rob him. Ultimately, defendant admitted he shot the man when he and a "tagger" nicknamed "Rampage," attempted to rob the victim. Defendant said he began shooting when the victim reached for something "black" in his waist. He fired "may[be] seven" times and described the shooting as follows: "I went . . . (clap, clap)," hesitated, "and then (clap, clap, clap, clap)." He also acknowledged committing another robbery earlier that evening.

At trial, a firearms expert testified he inspected the weapon, plus the casings found at both the murder scene and casings obtained from test-firing the weapon. Based on his inspection, the expert concluded the handgun found in defendant's car was the firearm used to shoot Lopez.

Anaheim Police Officer Jonathan Yepes testified as an expert on criminal street gangs. Yepes described the history, size, activities, hand signs, symbols, and activities of a group named Boys from the Hood, also known as the Anaheim Boys. Through Yepes, the prosecution introduced documentation establishing the predicate crimes committed by members of Boys from the Hood. He opined Boys from the Hood constituted a criminal street gang. In addition, based on documentation relating to defendant, Yepes said it was his opinion that, for several years prior to and on the day of Lopez's murder, defendant was an active member of Boys from the Hood. Based on his knowledge of street gangs, Yepes also concluded the person with defendant when Lopez

4

was killed was also a member of that gang.  Finally, Yepes explained how committing a robbery could benefit a criminal street gang.

DISCUSSION

*1. The Prosecution complied with the corpus delicti rule.*

After the prosecution rested, the defense unsuccessfully sought to dismiss the criminal street gang charge and gang enhancement on the ground the prosecution failed to establish the corpus delicti for the crime and the enhancement.  Defendant's opening brief expands this contention to include the murder charge, and the special circumstance allegations for gang participation and felony murder.

The Attorney General points out the corpus delicti for murder is satisfied by independent proof of a death resulting from criminal conduct, regardless of the prosecution's theory of how it occurred (*People v. Williams* (1957) 151 Cal.App.2d 173, 177), and thus independent proof defendant killed Lopez during an attempted robbery was unnecessary (*People v. Miller* (1951) 37 Cal.2d 801, 806).  Here, there was evidence Lopez died from wounds suffered when he was shot with a .380 caliber handgun.  The Attorney General also notes the Legislature statutorily eliminated the need to establish the corpus delicti of felony-based special circumstance allegations (Pen. Code, § 190.41), and case law has declared the corpus delicti rule inapplicable to other special circumstance allegations (*People v. Howard* (1988) 44 Cal.3d 375, 413-415; *People v. Shoemake* (1993) 16 Cal.App.4th 243, 254).

In his reply brief, defendant concedes the Attorney General is correct on the murder charge and the felony-murder special circumstance allegation.  But he still maintains the prosecution was required to establish the corpus delicti for the street gang special circumstance allegation, the substantive gang crime, and gang enhancement.

5

These arguments lack merit. "[T]o ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1169), "[i]n every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause." (*Id.* at p. 1168.)

First, the prosecution introduced sufficient independent evidence to establish the corpus delicti of the gang crime. "The gravamen of the substantive offense . . . is active participation in a criminal street gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 55.) To support a conviction the prosecution must show "active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; . . . knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and . . . the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.)

Madrigal testified he saw two persons approach and assault Lopez. Yepes opined that, at the time of Lopez's murder, defendant was an active participant in a criminal street gang known as Boys from the Hood or Anaheim Boys. He supported defendant's gang involvement by citing notices defendant received in prior police contacts, photographs of him with gang members that depicted him making gang hand signs, and written materials wherein defendant expressed his allegiance to the gang. Yepes noted one of the gang's primary activities was committing robberies. He also explained the concept of "backup" in the criminal street gang context and concluded it was likely the other person with defendant belonged to the gang. This evidence satisfied the corpus delicti rule. "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so

6

long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency." (*People v. Alvarez, supra,* 27 Cal.4th at p. 1171.)

Second, we reject defendant's attempt to extend the corpus delicti rule to nonfelony special circumstance and other enhancement allegations. As previously mentioned, case law holds the rule is inapplicable to nonfelony-based special circumstance allegations. In addition, case law also holds it does not apply to "the facts necessary for the enhancement of the penalty for an offense." (*People v. Miranda* (2008) 161 Cal.App.4th 98, 108; see *People v. Shoemake, supra,* 16 Cal.App.4th at p. 255 [same; "An enhancement does not define a crime but merely imposes additional punishment for a crime when certain circumstances are found to exist"].)

Defendant argues the foregoing decisions have been abrogated by the United States Supreme Court's decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 LEd.2d 435]. He is wrong. *Apprendi* declared "that 'under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" (*Id.* at p. 476.) Thus, *Apprendi* concerns the burden of proof necessary to establish some ground for increasing a defendant's punishment. California law imposes on the prosecution the duty to establish special circumstance and enhancement allegations by proof beyond a reasonable doubt. (Pen. Code, § 190.4, subd. (a) [special circumstances]; *People v. Lewis* (1991) 229 Cal.App.3d 259, 264 [enhancements]; *People v. Nelson* (1978) 85 Cal.App.3d 99, 103 [same].)

But, "The corpus delicti rule is a rule of law that governs the admissibility of evidence," and "has no bearing on the prosecution's burden to prove beyond a reasonable doubt all elements of the offense." (*People v. Diaz* (1992) 3 Cal.4th 495, 529; see *People v. Shoemake, supra,* 16 Cal.App.4th at p. 253 [same].) It merely requires the prosecution introduce some minimal independent proof that a crime was committed

7

before it may be allowed to present a defendant's incriminating statements at trial. (*People v. Alvarez, supra,* 27 Cal.4th at p. 1171.) Since *Apprendi* and the corpus delicti rule serve different purposes and apply at different stages of a criminal trial, the former did not abrogate the latter.

Defendant's reliance on the corpus delicti rule lacks merit.

### 2. *The trial court properly admitted the videotape of defendant's interrogation.*

#### 2.1. *Background*

Before trial, the defense moved to exclude the admission of defendant's statements during his interrogation, arguing he requested an attorney when arrested in Fullerton, the detectives questioned him without the presence of the attorney appointed to represent him on the firearm charge, and his statements during the interrogation were involuntary. During a pretrial hearing, the court rejected the first and second claims. At defense counsel's request, the court agreed to rule on the voluntariness issue after the videotape of the interrogation was played during trial.

Once the prosecution rested, defense counsel sought exclusion of the videotape. Citing the fact defendant had been awake for over 19 hours and that, at one point during the interrogation when defendant inquired about the length of a possible prison sentence, a detective mentioned he was retiring in eight months, counsel argued defendant's statements were obtained by an implied promise of leniency. "Someone being up that long, it's reasonable to conclude that anybody hearing that is going to be interpreting the answer as an eight-month offer, to come clean." The trial court denied the motion.

On appeal, defendant repeats his claim the police questioned him without his attorney being present and expands his attack on the voluntariness of the statements. On the latter issue, defendant cites his age, physical condition, custodial status, plus the

8

location and length of the interrogation. He also faults the detectives for using deception, implied promises of leniency, and references to his religious beliefs.

### 2.2. *The Interrogation*

According to the transcript of the interrogation, the detectives began questioning defendant around 8:15 p.m. Defendant said he was 21 years old, had completed two years of college, majoring in criminal justice, and currently worked an overnight shift at a large department store in Long Beach. He spoke both English and Spanish. Defendant was not married, but his girlfriend was pregnant. He acknowledged he "used to bang" with the Anaheim Boys, but claimed he stopped several years earlier when served with a gang injunction.

After being advised of his *Miranda* rights, defendant agreed to speak with the detectives. He initially denied being in Santa Ana on the night of Lopez's murder, claiming he was at work. The detectives told him surveillance cameras had recorded him driving the Suburban in the city. Defendant then acknowledged going to Santa Ana that night to visit a former girlfriend, and that he was in the area where the Lopez murder occurred. He also admitted having a second female and another male who was wearing a black hooded sweatshirt in the Suburban, but denied having a weapon.

The detectives told defendant "[s]omething happened" where a person was "assaulted" and "got hurt," and "some witnesses" "pointed in [his] direction." Defendant then claimed the other male, who he identified as "Jose," had "a little beef" with a man, "took it to the next level" by pulling "out a strap [i.e., gun]" and "dropped the whole clip."

Defendant insisted he did not shoot the man, even after one officer suggested, "Jose said you shot him." The detectives told defendant they knew he had "more involvement" in the shooting and he had "a huge decision to make" about "whether or not [he want[ed] to tell [them] what truly happened."

9

Defendant then said he was trying to raise money so that he could buy his way out of the gang lifestyle. He admitted that he and "Jose" robbed another person earlier, but pocketed only $15. The two then attempted to rob Lopez. While asserting Lopez reached for something, he continued to insist it was "Jose" who shot the victim.

One detective said, "I'm hearing a little bit of fact, but a lot of fiction." The other officer then told defendant, "We know who is responsible, . . . the man who pulled that trigger, I'm looking at [him] right now."

Defendant continued to claim, "I did not shoot that man." One detective told defendant, "We've been doing our homework," they had already talked to several others, and the case against him was "extremely strong." But he continued, "I can tell you're sorry that that night ever happened," and wanted to "make sure I've got one hundred percent the fact out of your mouth. And if this guy did something, if this guy pulled something, if . . . you didn't mean to shoot and it was a startle . . ., I need to know that because that plays into all this."

Defendant asked "what kind of charges am I facing?" An officer explained he was looking at murder and robbery. Defendant asked "[h]ow much time am I facing," and the detectives replied, "we don't know." Defendant then answered his own question. Recognizing the nature of the charges, plus his "possession of a handgun," "[t]he way it is, everything all together. That's life." An officer replied, "I'm not gonna lie . . ., you're looking at some serious charges," and "I can't make you any promises."

Defendant continued to insist he "didn't pull that trigger," but repeated the claim that Lopez "looked like he was gonna pull out a gun" before being shot. A detective said, "If . . . that's what you want to go down, that's the way it'll go down. That's the way we'll put it on the paper."

Defendant complained the detectives did not believe him. One officer said, comparing "what eyewitnesses are telling me" with "what the physical evidence is telling me," the "witnesses [are] saying what the physical evidence shows."

10

After discussing where defendant was living before his arrest, obtaining his written authorization to search the premises, and how long he might remain in pretrial custody, the detectives asked defendant about what he was wearing the night of Lopez's murder. Defendant admitted wearing a hooded sweater or shirt that was some color other than black. He also acknowledged wearing black gloves. When he said he threw away the clothes he wore the night of the murder, one detective asked, "why would an innocent man throw away clothes?" Defendant acknowledged he was worried some of the gun powder may have landed on him.

A detective again accused defendant of shooting Lopez and asked, "Do you believe in God?" Defendant responded yes. The detective then said, "Is God gonna accept you at the pearly gates, man, you're sitting here lying to two detectives who know what . . . they're doing?"

The officer then asked defendant, "Did you . . . shoot that guy?" Defendant asked, "Now, before I answer this question, will I ever see daylight?" A detective responded, "That's up to the D.A. to decide. I can't make promises, dude. I don't know. I could tell you one thing. By the time you get out, I'll be retired. That's only eight more months."

Defendant then admitted he shot Lopez, repeating his claim that Lopez reached for something in his waistband and it "looked like . . . he was gonna pull out a gun."

Defendant also said he had snorted "About ten lines" of cocaine earlier that evening. In addition, he said the man with him was not named "Jose," but was a "tagger" nicknamed "Rampage" that "kicks with the . . . West Side Compadres." After the shooting, defendant ran to the Suburban which was parked in a commercial area with one of the women at the wheel. He later burned the clothes he was wearing that night. At the end of the interrogation, defendant continued to ask if he was facing a life sentence. The officers responded "that's not our decision to make," but noting he was "a young man,"

11

"there's always the . . . possibility of you getting out." The detectives obtained a buccal swab from defendant to test his DNA, noting the time as "2221."

### 2.3. Analysis

Defendant initially suggests the detectives violated his right to counsel by questioning him "without the consent or presence of [the] lawyer" appointed to represent him on the firearm charge. "[T]he Sixth Amendment right to counsel is 'offense specific'; it arises and may be asserted only as to those offenses for which criminal proceedings have formally begun," and "[a] defendant's incriminating statements about offenses for which he has not been charged may be admitted consistently with his Sixth Amendment counsel guarantee notwithstanding its attachment on other charged offenses at the time." (*People v. DePriest* (2007) 42 Cal.4th 1, 33; see *Texas v. Cobb* (2001) 532 U.S. 162, 167 [121 S.Ct. 1335, 149 L.Ed.2d 321]; *People v Slayton* (2001) 26 Cal.4th 1076, 1082 [right to counsel does not extend "to ""'closely related'"" or ""'inextricably intertwined'"" uncharged offenses"].)

Without citing to the record, defendant claims "the detectives did question [him] about the presence of the firearm in the Suburban." The record fails to support this assertion.

The pending charge was possession of a loaded firearm and the detectives told defendant they wanted to talk to him about an incident that had "absolutely nothing to do with why you're currently in jail." On a few occasions defendant brought up the pending firearm charge, but the detectives said they were "gonna stay away from that because you got certain rights and we don't wanna . . . violate those." Further, subsequent references to the gun focused on Lopez's murder, not the fact defendant subsequently possessed a loaded weapon. When defendant claimed "Jose" "pulled out a strap" and shot a man over a personal "beef," a detective asked, "What kind of strap was it?" Defendant responded, "[t]he strap that I'm going down for." Later, before defendant

12

acknowledged he shot Lopez, one detective mentioned the discovery of "a gun in your car," and commented, "I can't comprehend why you still have the strap." What's more, the current prosecution does not include the possession charge. Thus, we find no violation of defendant's Sixth Amendment right to counsel occurred in this case.

The record also reflects the prosecution carried its burden of showing defendant's statements were voluntary. To be voluntary, the confession or statement must be "the product of [the defendant's] free and rational choice." (*Greenwald v. Wisconsin* (1968) 390 U.S. 519, 521 [88 S.Ct. 1152, 20 L.Ed.2d 77]; see *People v. McWhorter* (2009) 47 Cal.4th 318, 346.) In determining voluntariness, "the question in each case is whether the defendant's will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [83 S.Ct. 917, 9 L.Ed.2d 922]; see *People v. McWhorter, supra,* 47 Cal.4th at pp. 346-347.) "[B]oth state and federal . . . courts apply a 'totality of circumstances' test to determine the voluntariness of a confession." (*People v. Massie* (1998) 19 Cal.4th 550, 576.) "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" (*Colorado v. Connelly* (1986) 479 U.S. 157, 167 [107 S.Ct. 515, 93 L.Ed.2d 473]; see *People v. Hensley* (2014) 59 Cal.4th 788, 814), "but [coercion] does not itself compel a finding that a resulting confession is involuntary." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041.) Other "factors to be considered are '". . . the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health."'" (*People v. Massie, supra,* 19 Cal.4th at p. 576.)

"The state must demonstrate the voluntariness of a confession by a preponderance of the evidence." (*People v. Hensley, supra,* 59 Cal.4th at p. 812; see *Lego v. Twomey* (1972) 404 U.S. 477, 489 [92 S.Ct. 619, 30 L.Ed.2d 618].) Generally, "the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of

13

the confession is subject to independent review." (*People v. Massie, supra,* 19 Cal.4th at p. 576.) Since this case involves a videotaped interrogation and there is no dispute concerning the facts surrounding it, we independently review the trial court's ruling. (*People v. McWhorter, supra,* 47 Cal.4th at p. 346.)

The trial court properly admitted the videotape of defendant's interrogation. At the time, defendant was young but had, by his own admission, completed two years of college with his studies focused on criminal justice. In addition, through his gang ties defendant had previous contacts with the police.

Defendant was in custody on the firearm charge during the interrogation. But the detectives informed him of his constitutional rights and he agreed to speak with them. Based on defendant's responses to the detectives' questions and his repeated queries about his potential punishment, defendant's assertion he was sleep deprived is unavailing.

While the parties agree the questioning lasted "for over three hours," the transcript indicates it was only slightly over two hours in length. One detective noted the time as 8:14 p.m. when the interrogation began. After it ended, the detectives obtained defendant's DNA sample, noting the time as "2221," i.e., 10:21 p.m. In any event, defendant fails to present any authority that a three and one-half hour interrogation rendered his confession involuntary as a matter of law. (*Berghuis v. Thomkins* (2010) 560 U.S. 370, 387 [130 S.Ct. 2250, 176 L.Ed.2d 1098] [three hour interrogation while sitting in straight-backed chair; "there is no authority for the proposition that an interrogation of this length is inherently coercive"].)

Defendant complains the detectives used deception, lying to him about the existence of surveillance cameras recording his presence in Santa Ana on the night of Lopez's murder and that they had talked to other witnesses who identified him as the shooter. "[T]he use of deceptive comments does not necessarily render a statement involuntary. Deception does not undermine the voluntariness of a defendant's statements

14

to the authorities unless the deception is ""'of a type reasonably likely to procure an untrue statement.'"" [Citations.] "'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.'"" (*People v. Williams* (2010) 49 Cal.4th 405, 443; see *People v. Hensley, supra,* 59 Cal.4th at p. 813.) The record fails to reflect the detectives' falsehoods constituted prohibited deception.

Nor did the detectives make any promises of leniency to encourage defendant's admission that he shot Lopez. Rather, they acknowledged he was facing "serious charges" and repeatedly told him, both before he confessed and afterwards, "we don't know" how long of a prison sentence he might receive. As the trial court noted, he continued to ask the detectives if he was "facing life" after he confessed. In fact, defendant's own statements suggest he knew it would likely be a life sentence.

Finally, the single reference to God did not render the confession involuntary. It is improper for the police to employ "'[t]he tactic of exploiting a suspect's religious anxieties[,]'" but where "police comments are not 'calculated to exploit a particular psychological vulnerability of [the] defendant,' and 'no acute religious anxiety or sense of guilt was apparent from prior questioning,' appeals to religion are unlikely to be a motivating cause of a defendant's subsequent confession." (*People v. Carrington* (2009) 47 Cal.4th 145, 176; see *People v. Kelly* (1990) 51 Cal.3d 931, 951, 953 [questions about whether the defendant "believe[d] in Jesus" and if he received "a Christian upbringing" did not "appear to have been calculated to exploit a particular psychological vulnerability of defendant" since "no acute religious anxiety or sense of guilt was apparent from prior questioning"].) As in *Kelly*, defendant fails to cite to anything suggesting he was a deeply religious person or that the detectives were attempting to exploit his beliefs. (See *Berghuis v. Thomkins, supra,* 560 U.S. at p. 387 ["question[s] referr[ing] to [suspect's] religious beliefs . . . did not render . . . statement involuntary"].)

15

Viewing the totality of the circumstances surrounding the interrogation, we conclude defendant's statements were voluntary and the trial court properly admitted the videotape of his interrogation at trial.

*3. There was no prejudicial instructional error.*

### *3.1. Background*

Count 1 of the information alleged defendant violated Penal Code section 187, subdivision (a), by "unlawfully and with malice aforethought kill[ing]" Lopez. But at trial, the prosecution relied solely on a felony-murder theory, arguing he killed Lopez during an attempted robbery.

During a hearing on jury instructions, the following colloquy occurred: "The Court: There doesn't appear to be under the state of the evidence thus far any lesser included offenses. The prosecution is taking that position. [¶] Mr. Fascenelli [defense counsel], what's your position on that? [¶] Mr. Fascenelli: I don't think there are any lesser included offenses that are sua sponte that need to be included. [¶] The Court: Let me ask then, may I presume that absent a request for them, you have tactically chosen not to request them? [¶] Mr. Fascenelli: Yes."

Defendant now argues the trial court's failure to instruct, sua sponte, on second degree murder, voluntary manslaughter, and involuntary manslaughter constituted reversible error. We disagree.

### *3.2. Analysis*

"In criminal cases, even absent a request, a trial court must instruct on the general principles of law relevant to the issues the evidence raises. [Citation.] '"That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than

16

that charged. [Citations.]"' [Citation.] '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.'" (*People v. Taylor* (2010) 48 Cal.4th 574, 623; see *People v. Banks* (2014) 59 Cal.4th 1113, 1159.) "'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.'" (*People v. Banks, supra,* 59 Cal.4th at p. 1160.)

The Attorney General argues defendant invited the error because his trial attorney "told the trial court it was his tactical decision not to request instruction on lesser included offenses." But "[t]he obligation to instruct on lesser included offenses exists even when a defendant, as a matter of trial tactics, objects to their being given." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) While "the doctrine of invited error will operate to preclude a defendant from gaining reversal on appeal because of such an error made by the trial court at the defendant's behest" (*People v. Duncan* (1991) 53 Cal.3d 955, 969), it only applies where "'it [is] clear from the record that defense counsel made an express objection to the relevant instructions,'" and "'that counsel acted for tactical reasons and not out of ignorance or mistake'" (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1234). The record in this case fails to clearly establish these requirements. Defense counsel did not object to a proposal to give lesser included instructions on count 1, but merely acceded to the trial court's conclusion no lesser included offenses were necessary and agreed he was doing so for unspecified tactical reasons. (*People v. Valdez* (2004) 32 Cal.4th 73, 115 [defense counsel's statement he "did 'not want to request any lessers'" too ambiguous to apply . . . doctrine].) Even so, on the merits we find no prejudicial instructional error occurred.

17

### 3.2.1. *Second Degree Murder*

Both parties acknowledge the Supreme Court has, to date, not decided whether second degree murder is a lesser included offense of felony murder. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1328-1329; *People v. Taylor, supra,* 48 Cal.4th at p. 623; *People v. Wilson* (2008) 43 Cal.4th 1, 16, fn. 5; *People v. Valdez, supra,* 32 Cal.4th at pp. 114-115, fn. 17.) However, the prosecution charged defendant with malice murder under Penal Code section 187, subdivision (a). Thus, "under the accusatory pleading test, second degree murder was plainly a lesser included offense of felony murder *as charged.*" (*People v. Banks, supra,* 59 Cal.4th at p. 1160.) Further, at least two appellate court decisions have held a sua sponte duty to instruct on second degree murder exists if the evidence fails to *indisputably* show a homicide committed during the course of one of the felonies listed in Penal Code section 189. (*People v. Campbell* (2014) 227 Cal.App.4th 746, 763 [defendant testified he did not know robbery in progress and began "shooting at people as a 'reaction' to the situation and with 'no idea what was going on[]'"]; *People v. Anderson* (2006) 141 Cal.App.4th 430, 447 ["Defendant's description of the chain of events, combined with the pathologist's testimony, constituted substantial evidence to support a conclusion that defendant did not decide to take the victim's money until he had been mortally wounded"].)

Defendant claims his "contradictory" statements to the detectives during the interrogation made it "reasonable for a properly instructed jury to doubt" Lopez was killed during an attempted robbery, and that the use of the gun could be viewed as an inherently dangerous grossly negligent discharge of a firearm. Even assuming defendant's argument has merit, any error in failing to instruct on second degree murder was harmless.

First, the Supreme Court's recent decision in *Banks* holds that the mere presence of substantial evidence to justify a second degree murder instruction where the prosecutor relies solely on a felony-murder theory is not sufficient to support reversal.

18

There the defendant approached a man named Foster near an automated teller machine (ATM) and, after a brief discussion, shot and killed him. As here, there was no evidence the defendant stole anything from Foster and, while the prosecution charged the defendant with malice murder, at trial it proceeded solely on a felony-murder theory. (*People v. Banks, supra,* 59 Cal.4th at pp. 1157-1158.)

While agreeing "[t]he evidence of second degree murder in the Foster shooting, though not particularly strong, was sufficient to obligate the trial court to instruct on second degree murder" (*People v. Banks, supra,* 59 Cal.4th at p. 1160), the Supreme Court found the error harmless. "Our precedent holds that an erroneous failure to instruct the jury on a lesser included offense is subject to harmless error analysis . . . and that evidence sufficient to warrant an instruction on a lesser included offense does not necessarily amount to evidence sufficient to create a reasonable probability of a different outcome had the instruction been given. [Citations.] Here, there is no reasonable probability that the evidence of an argument between [the] defendant and Foster, minimal as it was, would have led the jury, had it been properly instructed, to conclude that [the] defendant shot Foster at the ATM out of malice unrelated to any robbery. As the trial court observed, even though there was 'some evidence' otherwise, the far more plausible inference is that the 'fellow was killed at the A.T.M. to try to get money.' Thus, the trial court's failure to instruct on second degree murder was harmless." (*Id.* at p. 1161.)

The same is true here. Nothing in defendant's statements justifies his grossly negligent discharge of a firearm argument. Regardless of who shot Lopez and why, defendant acknowledged the shooter fired several times. Further, only the first of defendant's three contradictory explanations about how the shooting occurred, i.e., "Jose" shot Lopez over a personal "beef," suggests a motive other than robbery. That weak inference pales in comparison with the evidence pointing towards robbery as the reason defendant and his confederate accosted Lopez. The other two explanations, which only

19

differ on the issue of who wielded the gun, are premised on an attempted robbery. Madrigal's testimony also bolsters the theory of a killing during an attempt to commit robbery. He testified two men in hooded sweatshirts with the hoods pulled over their heads ran up behind Lopez and grabbed him in a chokehold. At that point, Madrigal's car was struck by a bullet. After going around the block, Madrigal saw the Suburban positioned as a getaway vehicle with the hooded assailants running towards it.

Second, the jury in this case also returned a true finding on the felony-murder special circumstance allegation. In *Castaneda*, the Supreme Court held a true finding on felony-murder special circumstance allegations eliminated any prejudice from the failure to instruct on second degree murder as a lesser included offense. "Because 'the elements of felony murder and the special circumstance[s] coincide, the true finding[s] as to the . . . special circumstance[s] establish[] here that the jury would have convicted defendant of first degree murder under a felony-murder theory, at a minimum, regardless of whether more extensive instructions were given on second degree murder. [Citations.]' [Citation.] Therefore, the jury necessarily found defendant guilty of first degree felony murder, and any error in not instructing the jury concerning second degree murder was harmless beyond a reasonable doubt." (*People v. Castaneda, supra,* 51 Cal.4th at p. 1328; see *People v. Huynh* (2012) 212 Cal.App.4th 285, 315 [same].) The same is true here.

### 3.2.2. Manslaughter

Defendant's arguments that the court was also obligated to instruct on voluntary and involuntary manslaughter are equally meritless. As discussed above, defendant's statements indicate Lopez was intentionally shot either because of a personal "beef" or when he reached for a weapon while the assailants were attempting to rob him. There is no evidence other than sheer speculation that Lopez's killing resulted from criminal negligence or that defendant and his confederate were only attempting to falsely

20

imprison the victim. "Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense." (*People v. Wilson* (1992) 3 Cal.4th 926, 941; see *People v. Castaneda, supra,* 51 Cal.4th at pp. 1330-1331 [applying rule to voluntary manslaughter].)

Defendant argues he was entitled to an instruction on voluntary manslaughter on the theory of imperfect self-defense because he told the detectives Lopez "suddenly reached and retrieved an[] object, and . . . a utility knife was found in [his] hand." But defendant mentioned Lopez's attempt to reach for a weapon only when claiming he and his confederate attempted to rob the victim. Since "defendant's testimony showed him to be the initial aggressor and the victim's response legally justified, defendant could not rely on unreasonable self-defense as a ground for voluntary manslaughter." (*People v. Seaton* (2001) 26 Cal.4th 598, 664 [rejecting imperfect self-defense]; see *People v. Balderas* (1985) 41 Cal.3d 144, 196-197 [rejecting heat of passion instruction claim: "This court has concluded, under similar circumstances and without extended discussion, that 'predictable conduct by a resisting victim' of a felony cannot 'constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter'"].) Thus, defendant's imperfect self-defense argument lacks merit.

## 4. There was no prosecutorial misconduct.

Defendant contends the prosecutor committed misconduct both during his closing and rebuttal arguments.

### 4.1. The "last link" Comment

When the prosecutor began his closing argument, he made the following statement: "You're the last link in this system. You are the last link. You get to decide what the facts are, not me, not the defense attorney, not the judge. You do and then you get the wonderful job, which you may not realize it now, but it will be the wonderful job

21

of holding the defendant accountable for what he did that night or that morning.  He killed an innocent man in cold blood and I hope you realize what a powerful job you have and what a wonderful job it is, that you get to hold him responsible for that, because it's not going to be me, it's not the defense attorney, it's not the judge.  You are the last link in this system and it's an incredibly important job that you do.  So we thank you for your time."  Defendant argues the prosecutor's "last link" comment "suggested to the jury that it is just a link in the chain of law enforcement," thereby both aligning the jury with the state and minimizing its role in determining his guilt or innocence.

No misconduct occurred.  "'The standards governing review of misconduct claims are settled.  "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such '"unfairness as to make the resulting conviction a denial of due process."'  [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial."'"  (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.)

Misstating the applicable law during closing argument constitutes misconduct.  (*People v. Boyette* (2002) 29 Cal.4th 381, 435.)  But "the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made."  (*Boyde v. California* (1990) 494 U.S. 370, 385 [110 S.Ct. 1190, 108 L.Ed.2d 316].)  In reviewing a misconduct claim "based on the prosecutor's comments before the jury, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'"  (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

As for the "last link" statement, we first note defendant forfeited the issue.  ""'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review."'"  (*People v. Gonzales, supra,* 54 Cal.4th at

22

p. 1275.)  No objection or request for an admonition was made during trial respecting this statement.  In his reply brief, defendant notes he did cite the prosecutor's "last link" statement in his motion for a new trial.  This contention is contrary to the law.  (*People v. Williams* (1997) 16 Cal.4th 153, 254 [rejecting the defendant's "suggest[ion] he adequately preserved a prosecutorial misconduct claim by objecting 'in the context of a motion for new trial[]'"].)

Even on the merits, defendant's argument is unavailing.  While there appear to be no California cases on whether it is improper for a prosecutor to describe the jury as the "the last link in th[e] system," federal decisions have considered circumstances where such comments may viewed as improper.

In *Tucker v. Kemp* (11th Cir. 1985) 762 F.2d 1480, judgment vacated and cause remanded (1985) 474 U.S. 1001 [106 S.Ct. 517, 88 L.Ed.2d 452], the prosecutor told the jury during the sentencing phase of a capital case that although it was "the last link" in the process leading to a death verdict, the decision "does not rest on your shoulders" because "it's no more up to you than it is to anybody else, the grand jury or the police, or the district attorney's office.  All of us are coming in and doing our duty." (*Id.* at p. 1485.)  The court of appeals held the argument was improper since it had "the effect of trivializing [the jury's] importance."  (*Ibid.*)

Also, in *Coleman v. Brown* (10th Cir. 1986) 802 F.2d 1227, the court criticized a prosecutor's argument during the trial's guilt phase "that, following the police, the witnesses, and the district attorney's office, the jury was the final link in the chain of law enforcement" (*id.* at p. 1238), finding it improper on two grounds.  First, the comment "misstate[d] the role of the jury, placing it in an adversarial position with respect to the defendant," and second, it "tend[ed] to trivialize the jury's importance" by "suggesting that the jury is only the last link in a long decision" (*ibid.*).

This case is distinguishable from *Tucker* and *Coleman*.  Here, the prosecutor referred to the jury as "the last link" the fact finding process.  He juxtaposed

23

the jury's role with that of the court and the parties in determining whether defendant was guilty of the charged crimes. Further, unlike the federal decisions, the prosecutor's "last link" comment described the jury's role as "an incredibly important job," rather than trivializing it. Thus, we agree with the trial court's conclusion that the prosecutor's comment did not seek "to abrogate or lessen the jury's role or their responsibility." (*People v. Brown* (2003) 31 Cal.4th 518, 553-554 ["'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements'"].)

### 4.2. The Jigsaw Puzzle PowerPoint

During rebuttal, the prosecutor displayed a PowerPoint diagram depicting a jigsaw puzzle of an elephant with several pieces missing. The diagram was entitled, "Look at all of the evidence together." Referring to the diagram, the prosecutor argued: "Defense counsel wants you to look at these missing pieces of the puzzle, . . . DNA, GSR. . . . [T]hat's why I use this exhibit – when you stand back and look at everything, . . . it really shows you what's going on in this case. [¶] If you just focus on the right corner of this puzzle [depicting part of the elephant's trunk], it's a great curled something, I don't know. I'm just focusing on this one piece. I don't know what it is. That's what defense counsel wants you to do. Focus on each piece. [¶] I ask you to put all the pieces together and look at the picture. When you look at all the pieces of this puzzle together, even though there's some pieces missing, you really get an idea of what happened that night."

After jury deliberations began, the defense moved for a mistrial, citing the jigsaw puzzle. The court found the objection timely but denied the motion, concluding the prosecutor did not "use[] the puzzle to equate it to the reasonable doubt standard." Nonetheless, during a break in the jury's deliberations, the trial court gave it the following admonishment. "At the tail end of [the prosecutor's] final argument yesterday,

24

you may remember he put up a picture, it was a puzzle with some pieces missing . . . . He never equated that in his argument to the reasonable doubt standard. I just wanted to make sure all of you understood that that's not the way reasonable doubt works. . . . [¶] If anybody was confused about that, then I want you to disregard the whole puzzle analogy because reasonable doubt is not like looking at a picture of a puzzle. The definition is the one that I have now twice given you. You have it in your formal instructions, you are to be guided by my instruction on reasonable doubt and not try to quantify it into any slides or diagrams you may have seen during closing argument."

Defendant now claims the prosecutor employed it "to illustrate the reasonable doubt standard," and "conveyed an impression of a lesser standard of proof." We disagree.

In *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, the court held a prosecutor committed misconduct by using a partially completed jigsaw puzzle of the Statue of Liberty to explain reasonable doubt. "The presentation, with the prosecutor's accompanying argument, leaves the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence" and "invite[d] the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*Id.* at p. 1267.) *Katzenberger* also held use of a puzzle with a few missing pieces suggested an improper quantification of the reasonable doubt standard. (*Id.* at pp. 1267-1268.)

In *People v. Otero* (2012) 210 Cal.App.4th 865, this court followed *Katzenberger*, finding a prosecutor committed misconduct by attempting to explain the concept of reasonable doubt with a diagram depicting the outlines of the states of California and Nevada along with symbols and city names, albeit with some of the information in an incorrect location. In addition, the diagram bore the title "'No Reasonable Doubt'" and contained the statement "'Even with incomplete and incorrect

25

information, no reasonable doubt that this is California.'" (*Id.* at p. 869.) We held, "The use of a diagram such as the one used in this case is simply not an accurate analogy to a prosecutor's burden to prove beyond a reasonable doubt each and every element of a charged offense." (*Id.* at p. 873.)

Again, the jigsaw puzzle and the prosecutor's concomitant argument is materially distinguishable from the foregoing cases. Contrary to *Katzenberger* and *Otero*, the prosecutor employed the elephant puzzle, not to explain the concept of reasonable doubt, but to counter defense counsel's focus on evidence the prosecution failed to present. The diagram was entitled, "Look at all of the evidence together," and the prosecutor argued, "When you look at all the pieces of this puzzle together, even though there's some pieces missing, you really get an idea of what happened that night."

In addition, when denying defendant's motion for a new trial, the trial court below found "any error" in the prosecutor's use of the elephant jigsaw puzzle to be "minimal" and "cured by the . . . admonition." We agree.

Further, even that "minimal" error was cured by the trial court's admonishment that the jury not confuse the puzzle with the concept of reasonable doubt, but "be guided" by "[t]he definition" of reasonable doubt "that I have now twice given you." Both *Katzenberger* and *Otero* found the misconduct in those cases harmless because the trial court either clarified what constituted reasonable doubt (*People v. Katzenberger, supra,* 178 Cal.App.4th at pp. 1268-1269), or admonished the jury to disregard the prosecutor's diagram (*People v. Otero, supra,* 210 Cal.App.4th at p. 873). (*People v. Wash* (1993) 6 Cal.4th 215, 263 ["We presume that the jury heeded the admonition"].) Here, the admonishment also eliminated any potential harm.

26

*5. Defendant was not denied the effective assistance of counsel at trial.*

        *5.1. Background*

During closing argument, defendant's trial counsel attacked the credibility of the confession and focused on the missing forensic evidence to corroborate it. He claimed defendant was tired when the detectives questioned him and he merely adopted "everything that the police thr[e]w out for him to latch onto." Counsel asserted defendant only confessed after the detectives suggested he would get a short prison sentence by doing so. "They're saying he's lying. So why would you believe him in the end? Just because that's the path they want you to believe. We're going to throw out different . . . things for him to grab hold to, and that's what they do. . . . [¶] So why believe the end . . . [i]f you're not going to believe the beginning."

Further, counsel emphasized what he described as the lack of corroborating evidence for the confession. "[W]here's your corroboration? Don't you want to corroborate what he says . . . ." "You've got to look at that long and arduous interview, and you will see the progression. And my question . . . is, well, if you're going to believe the end, you have to . . . vet the answers that [defendant] gives the police. You have to vet them for truthfulness. They didn't do that."

Finally, defense counsel argued defendant likely confessed to protect his gang. "You don't have to believe the confession because the confession was full of a bunch of baloney at the beginning, and a bunch of baloney at the end, and why? Is there a motivation for that? You bet, because the officer told you, they'll do anything for their gang. They'll lie for their gang, they'll accept responsibility for the gang because at the very end, he doesn't want to be a rat. Fine. Eight months? I'll take it."

After trial, the court granted defendant's request to relieve Fascenelli as his attorney and appointed the public defender to represent him. Subsequently, the defense moved for a new trial, in part arguing Fascenelli failed to competently represent him.

27

The grounds included Fascenelli's alleged inadequate investigation of the case, plus his failure to call witnesses, and request jury instructions.

At a hearing on the motion, Fascenelli testified on his experience in handling criminal matters generally and defendant's case in particular. He said he discussed aspects of the case with defendant on several occasions either in person or by telephone. Fascenelli consulted with his investigator, a former police officer, about the firearm but otherwise did not contact any other experts. Fascenelli concluded the best approach to defending the case was to challenge the veracity of defendant's confession.

The trial court denied the motion. The court concluded it could not find "Mr. Fascenelli's representation fell below an objective standard of reasonableness," citing his "tactical decision to attack and discredit . . . the confession . . . on multiple levels" and also argue "the police did nothing to test the physical evidence to corroborate the defendant's statements."

### 5.2. Analysis

On appeal, defendant reasserts the ineffective assistance of counsel claim. He argues Fascenelli breached his professional duty by failing to investigate and call potentially exculpatory witnesses, and attacks the failure to request jury instructions on the crimes of second degree murder and voluntary and involuntary manslaughter.

"'When the basis of a challenge to the validity of a judgment is constitutionally ineffective assistance by trial counsel, the petitioner must establish either: (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations]; or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable

28

outcome.' [Citation.] . . . [A] ""reasonable probability is defined as one that undermines confidence in the verdict.""" [Citation.]" (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [104 S.Ct. 2052, 80 L.Ed.2d 674]; see *People v. Brown* (2014) 59 Cal.4th 86, 109.) Thus, in considering an ineffective assistance of counsel claim on appeal, we "defer to counsel's reasonable tactical decisions" (*People v. Lucas* (1995) 12 Cal.4th 415, 436), and """"will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission[]""" (*People v. Bradford, supra,* 14 Cal.4th at p. 1052).

### 5.2.1. Failure to Request Jury Instructions

Defendant's claim that Fascenelli was incompetent by not requesting instructions on second degree murder and manslaughter is based on the same arguments we have previously found lack merit. For the same reasons, the ineffectiveness claim for not requesting jury instructions on lesser included crimes is also unavailing.

### 5.2.2. *Failure to Investigate Potentially Exculpatory Witnesses*

Defendant argues Fascenelli "failed to contact, interview, and subpoena for trial several crucial defense witnesses." To succeed on the claim, he "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel" by "demonstrat[ing] that counsel knew or should have known that further investigation was necessary, and must establish the nature and relevance of the evidence that counsel failed to present or discover." (*People v. Williams* (1988) 44 Cal.3d 883, 937; see *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1121.)

### 5.2.2.1. *Marco Padilla*

The first allegedly exculpatory witness was Marco Padilla (sometimes erroneously referred to as Perez in the police report). An officer interviewed Padilla the day after Lopez's murder. Padilla said he lived in a mobile home and his living room window faced onto the street where the murder occurred. According to the police report, "Between 11:30 P.M. and 12:00 A.M., [Padilla] looked out his living room window and saw three male juveniles running northbound [on] Sullivan Street along the east side of the street. [Padilla] then saw a 1985 to early '90s Dodge Intrepid drive northbound at a very slow speed with its headlights out. Shortly thereafter, he heard three to four gunshots. [Padilla] did not see the three subjects or the vehicle after the shots were fired." He gave a description of the juveniles' clothing and the vehicle's color, but "could not see inside the vehicle nor cou[]ld he provide a driver description. [Padilla] suspects the vehicle was following the three subjects. He could provide no additional information."

When contacted by an investigator from the public defender's office several years later, Padilla said "he looked out his living room window" after hearing "the sound of screeching tires." He "saw three males in a 1995-97, dark, 2-door Honda Accord with

30

the car's headlights out.  The Honda was driving at a fast speed before it came to a stop in the middle of the street and two guys got out through the passenger door.  The two males started running after a guy . . . headed north on Sullivan. . . .  When the suspects got closer to the victim, one male extended his arm and shot the victim multiple times.  Some of the shots may have hit a car.  Mr. Padilla saw the victim fall down.  About three minutes later the police arrived and assisted the victim."

Calling Padilla as a witness would not have assisted defendant's case.  For one thing, his initial statement contradicted the undisputed and physical evidence.  Lopez was in his late 40's.  He made his 9-1-1 call at 12:19 a.m., nearly 20 minutes after Padilla's time estimate.  And the police found six shell casings at the scene, a third to a half more than the number of shots Padilla claimed he heard.  Second, Padilla's later statement to the public defender's investigator contradicted his prior statement in several material respects.  Had he so testified at trial, would have been severely impeached on that ground as well.

### 5.2.2.1.  Defendant's Parents

The public defender attached declarations from defendant's parents to the new trial motion.  They attested that the Suburban belonged to them.  After defendant's arrest they recovered the vehicle.  At that time there was no sweatshirt in the Suburban.  Defendant's father declared that the day before the police impounded the Suburban, he used it to make a delivery and claimed, "Sometimes when I go out for a delivery[,] I take my gray zip-up hooded sweatshirt . . . with me . . . .  [¶] . . . I do not specifically remember if I took the gray sweatshirt with me for my delivery . . . .  [¶] . . . My gray sweatshirt did go missing around that time."

Defendant argues that, if called as witnesses at trial, his parents could have explained the sweatshirt belonged to his father (Mr. Ruedas) and that "the sweatshirt was placed in the vehicle by Mr. Ruedas after his son's arrest . . ., and before the Suburban

31

was seized and searched by the police." But Mr. Ruedas acknowledged he could not swear he placed the sweatshirt in the Suburban when he used it the day before the police impounded it. Further, defendant claimed he either threw away or burned the clothes he was wearing the night Lopez was murdered to avoid the discovery of any gun powder residue. What's more, the sweatshirt's ownership and location *a week after* Lopez's murder was collateral to the issues in this case. The parents' declarations did not assert defendant never used his father's sweatshirt or that Mr. Ruedas possessed it the night Lopez was killed. In addition, Fascenelli could have concluded that, given the obvious close relationship to defendant, his parents' testimony would have been of little assistance in light of their son's confession.

### 5.2.2.3. *The False Confession Expert*

Finally, defendant claims Fascenelli should have "consult[ed] with an expert on coerced and false confessions." He refers to a psychologist contacted by the public defender who apparently was prepared to testify defendant's "interrogation was psychologically coercive and that the detectives used several interrogation techniques that increased the risk of eliciting a false and unreliable confession."

This argument ignores the fact defendant's purported "false confession" was consistent with the physical and undisputed evidence and Madrigal's testimony. Madrigal saw two individuals wearing hooded sweatshirts run up to and assault Lopez and shortly thereafter saw the same two hooded persons fleeing towards a Suburban parked in a nearby shopping center. Defendant acknowledged he and his confederate were wearing hooded sweatshirts when they accosted Lopez and that after shooting him, fled to the waiting Suburban. Defendant said he shot Lopez when the victim reached for what he thought was a weapon. The police found a box cutter in one of Lopez's hands. Defendant admitted firing the gun six or seven times, and the police also recovered six shell casing at the murder scene.

32

Defendant argues his confession resulted from suggestions contained in the detectives' questions. Not exactly. While the police said they knew defendant was in Santa Ana the night of Lopez's murder, it was defendant who acknowledged he was in the area of the murder at the time it occurred. The police said that someone was hurt during an assault, but again it was defendant who first mentioned the use of a gun to shoot someone. It was also defendant who acknowledged he and his confederate were wearing hooded sweatshirts and gloves and that he shot Lopez six or seven times. We conclude calling a false confession expert likely would have hurt rather than help defendant's cause.

Consequently, defendant has failed to establish his ineffective assistance of counsel claim.

DISPOSITION

The judgment is affirmed.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.

33