Filed 3/5/20; Certified for Partial Publication 4/2/20 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.M.,<br><br>Defendant and Appellant. | E073805<br><br>(Super.Ct.No. RIJ1700999)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Matthew C. Perantoni, Judge. Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand, and Prabhath D. Shettigar, Deputy County Counsels, for Plaintiff and Respondent.

1

I

INTRODUCTION

A.M. (Mother) appeals from the juvenile court's order terminating her parental rights as to her two children, 11-year-old A.M. and six-year-old J.T., Jr. (J.T.).[1] On appeal, Mother argues (1) the order terminating her parental rights must be reversed because the Riverside County Department of Public Social Services (DPSS) failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and with Welfare and Institutions Code[2] section 224 et seq; and (2) all orders must be reversed because the juvenile court failed to comply with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) because California did not have subject matter jurisdiction. For the reasons explained herein, we reject Mother's contentions and affirm the judgment.

II

FACTUAL AND PROCEDURAL BACKGROUND

On December 2, 2017, DPSS received an immediate response referral with allegations of general neglect and sexual abuse. It was reported that Mother had allowed her two sons to go into a hotel room for hours with an 18-year-old male stranger who sexually abused them. After Mother discovered the sexual abuse, she failed to report the

_____

[1] R.O. (Father R.O.) is the father of A.M. and is not a party to this appeal. J.T., Sr., is the father of J.T. (Father J.T.) and is also not a party to this appeal.

[2] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

alleged crime to law enforcement. Instead, the suspect disclosed what he had done to his mother, who then drove the suspect to the police station to turn himself in.

When the social worker interviewed the boys, A.M. disclosed that he attended the third grade at an elementary school in Beaumont, but could not recall the last time he had attended school. He and J.T. had previously lived "with their father someplace far away as well." A.M. "believed they were living in Los Angeles with his father." They had "lived in a number of homes with friends." A.M. also reported Mother did not have much money so they had stayed in more than five or six homes with people willing to help them, "and all while he was eight years old." He and his family moved into their present hotel two days prior, but previously had lived with "various friends, family members of friends, and people they did not know before." A.M. also disclosed several incidents of domestic violence involving Mother and her significant other. J.T. stated that he "reside[d] with friends, his mother, his brother, his dad, 'Uncle Grandpa,' and 'Batman.'"

The social worker also interviewed and drug tested Mother due to her behavior. Mother drug tested positive for methamphetamine and amphetamine. Mother admitted to smoking methamphetamine. She reported that she had been diagnosed with anxiety, depression, and attention deficit hyperactivity disorder (ADHD) and was not on medication. When asked about her residence plan, Mother stated that she and her boys will stay with a friend in Victorville or she will find another place to go for the night. Her safety network consisted only of J.L., also known as "'Batman,'" because her former

3

foster family "moved out of state and abandoned her and the children." Mother also had a few friends who helped her by giving she and her sons a place to stay for a few days. Due to concerns for the children's safety, J.T. and A.M. were taken into protective custody.

When questioned about the children's placement, Mother informed the social worker that J.T.'s father resided in Arizona and is the only father A.M. had ever known.[3] Mother reported there was a family law case open in Las Vegas, Nevada. Father J.T. did not bring the boys back to Mother on time after a visit earlier this year. Mother did not believe Father J.T. could care for the children, because he was not stable and had a problem with alcohol.

The social worker thereafter contacted Father J.T. He stated that he lived in Arizona with relatives but was unable to provide a physical address, because he had just moved in. He and the paternal grandmother had been primarily caring for the children since they were babies. The children were with his mother for more than a year and with him for approximately five months in Las Vegas earlier this year. He also stated that Mother came to get A.M. and left with both children after a visit and that Mother has had the children in her care for only a few months. Father J.T. admitted having a drug and alcohol history and wanted the children to be released to him. He also agreed to contact the paternal grandmother to discuss possible placement of the children in her care.

---

[3] Father R.O. was incarcerated in state prison serving a 41-year-to-life sentence for first degree murder. He had been incarcerated since 2009 and had no contact with A.M. except through letters and telephone. The juvenile court later found Father J.T. to be the presumed father for both children.

On December 5, 2017, a petition was filed on behalf of the children pursuant to section 300, subdivisions (b) (failure to support), (d) (sexual abuse), and (g) (no provision for support).

Regarding ICWA, Mother was "unsure if she [was] of American Indian descent" and "denied that she or the children [were] registered with a tribe." Fathers J.T. and R.O. denied American Indian ancestry. At the detention hearing, both Mother and Father J.T. indicated having no American Indian ancestry. However, in Mother's ICWA-020 form, she checked the box indicating that she was or may be a member of, or eligible for membership in a federally recognized Indian tribe and wrote the tribe's name as "unknown." She also checked the box indicating that one or more of her parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe and wrote "MGF, MGA[C.M.]" beside the box. In Father J.T.'s ICWA-020 form, he stated that he had no Indian ancestry.

On December 6, 2017, the juvenile court formally removed the children from parental custody and found that ICWA may apply. The court authorized an Interstate Compact for Placement of Children (ICPC) with the state of Arizona and directed DPSS to continue with their assessment of relatives for placement.

On December 15, 2017, DPSS filed an ICWA-030 Notice of Child Custody Proceeding (ICWA notice) as to each child. In the ICWA notice, DPSS included each child's name, date and place of birth, and attached each child's birth certificate. The ICWA notices also included Mother's name, former address, and date and place of birth,

5

as well as Father J.T.'s name, former address, and date and place of birth. As to A.M., the ICWA notice included Father R.O.'s name, current address, and date of birth. Place of birth is indicated as "Unknown." Under the tribe box for Mother, the ICWA notices stated, "Bureau of Indian Affairs [(BIA)], No Tribe Specified." Under the tribe box for Father J.T. and Father R.O., the ICWA notices stated, "Does not apply." The ICWA notices also included the maternal grandmother's and maternal grandfather's names, former addresses, dates and places of birth, and dates and places of death. No tribe was specified for either maternal grandparent. The ICWA notices further noted the paternal grandmother's name (Father J.T.'s mother), current address and birth date. Under tribe, DPSS noted "Does not apply." No information was provided as to A.M.'s paternal grandmother or either childs' paternal grandfather. "M.T." is noted to be J.T.'s maternal great-grandmother with a current address of Los Angeles, California. No additional information was provided as to the children's maternal great-grandparents or Mother's grandfather's name (C.M.), or either child's paternal great-grandparents.

DPSS mailed the ICWA notices by certified mail on December 14, 2017, to the BIA. On December 29, 2017, the BIA acknowledged receipt of the ICWA notices and indicated that it is returning the "letter of inquiry due to insufficient information to determine tribal affiliation (25 CFR 23.11 (d)) or you have not identified a tribe. When additional information becomes available, please forward the Notice to the appropriate tribe(s) using the latest ICWA Designated Tribal Agents List."

On December 21, 2017, Mother informed the social worker that "she was told that she has Blackfoot and Cherokee tribe affiliation but was not registered." She also stated that she "planned to register with them on the day of contact." The social worker attempted to assist Mother in obtaining the contact information for the tribes so Mother could register but was unable to find such information. The social worker informed Mother that if she was "found to have affiliation with the tribes, she could be appointed an attorney from the tribes and placement of the children could change."

Mother disclosed that she was raised in the foster care system due to her biological parents not being involved in her life. She was placed in legal guardianship at the age of 18 months until she was 11 years old, and then was placed in group homes until she was emancipated from the system. She moved to Arizona in 2009 and remained there until August 29, 2016. She had been diagnosed with bipolar, depression, and ADHD, and had been prescribed multiple psychotropic medications.

Father J.T. reported that he was born in California, moving to Arizona shortly after his birth, returning to California for the second half of high school. He met Mother in 2009 and they moved in together with his family in 2011 until the end of their relationship in 2014. Mother then moved out and became a transient, while he kept the children. In the summer of 2017, Mother took the children back to California with her. He contacted law enforcement but "was informed he had no grounds to claim she kidnap[ped the children] since there was no court order from family law." He reported that he "filed the paperwork but was unable to follow through with it due to the mother's

whereabouts being unknown at that time." He "eventually was informed by people living in Arizona that the children were [in California]."

The social worker received a telephone call from a family member who reported the last time they had contact with the children was "during the summer of 2017" and that they were informed Mother "'stole'" the children from Las Vegas by hopping on a Greyhound bus. The family member also stated the last known location for Mother and children was them residing in Indio, California. The family member expressed a concern that the parents had been unable to keep a stable home for the children.

On December 21, 2017, Father J.T. informed the social worker that he had completed and submitted "family law orders" regarding J.T. after Mother "took his son without question." "He reported because the mother's whereabouts were unknown, he was unable to successfully serve her with the documents." He had received numerous messages on Facebook that the children were in Tucson, Arizona, but denied refiling the paperwork due to Mother then moving to Barstow and her allowing him to see the children. Mother was unaware of whether there were family law orders in place for J.T. She noted receiving documents in the mail a few days before her birthday in 2016 but the documents told her she did not have to appear in court. She believed Father J.T. "did not appear either and child support was established at that hearing."

Father J.T. also stated that A.M. was not attending school in Las Vegas and he was not aware if the child was attending school in either California or Arizona. He believed A.M. was enrolled in an elementary school in Barstow. The social worker attempted to

8

gather information from the "Corona/Norco" school district to determine how many schools A.M. had attended in California.

DPSS was unable to locate relatives for the children and placed them in foster care. DPSS eventually submitted an ICPC request on behalf of the paternal grandmother.

On January 8, 2018, Mother was arrested for robbery and was in jail.

On January 9, 2018, the juvenile court found "good ICWA notice" and continued the contested jurisdictional hearing for a placement assessment. The court authorized an ICPC with the paternal grandmother in Nevada.

On February 14, 2018, Mother was sentenced to two years in state prison for assault with a deadly weapon causing great bodily injury and evading a police officer.

At the contested jurisdictional/dispositional hearing held February 15, 2018, the juvenile court found the allegations in the first amended petition true and declared the children dependents of the court. Custody was removed from the parents and reunification services were ordered for Mother and Father J.T. Father R.O. was denied services under section 361.5, subdivisions (b)(12) and (e)(1). The court also ordered an ICPC with Father J.T. and found DPSS had conducted a sufficient ICWA inquiry and that ICWA may apply.

On July 10, 2018, Mother reported that she "may have Blackfoot Tribe ancestry" but that she was not registered. The social worker noted that it had been over six months since Mother first reported affiliation with the Blackfeet tribe and that she was not registered. However, Mother had not made any attempts to follow up on this

information.  The social worker therefore recommended the court find ICWA "does not apply to this case."  No ICWA notices were sent to the Blackfeet or Cherokee tribes.

On July 12, 2018, Mother reported that it was she who had initially completed and submitted family law orders for J.T., because Father J.T. had attempted to keep J.T. from her.  However, Mother did not follow through with filing the papers.  There were no family law orders in place at that time.

After Mother was released from custody on July 27, 2018, she enrolled in a drug treatment program.  She also participated in some of her services while incarcerated, and was taking prescription medication for depression and anxiety.  She did not have stable housing or employment.

Father J.T. did not participate in any services during the review period.  In addition, he was "'hearing voices in his head.'"  The state of Arizona denied his ICPC due to Father J.T.'s lack of compliance with the ICPC process.  Several attempts were made by Arizona's ICPC unit to conduct a home study of Father J.T.'s residence, but he did not cooperate.  Therefore, the ICPC referral was denied and closed.  Father J.T. said that he was homeless and currently staying at a friend's home in Arizona.

Neither parent had any in-person visitation with the children.  However, Mother had weekly monitored telephone contact with the children.  Father called the children once in the past six months but did not speak to them.

On August 15, 2018, the juvenile court found ICWA did not apply, continued reunification services for Mother, and terminated services for Father J.T.

By the 12-month review hearing, Mother did not have stable housing or employment. She was temporarily residing with a friend and occasionally cleaning houses for money. She had two active warrants for her arrest. In addition, she left her substance abuse program prior to its completion and did not enroll in another drug treatment program or counseling. Mother, however, completed a parenting course and randomly drug tested negatively. Her visits with the children were inconsistent and Father J.T. did not visit the children at all. During the reporting period, no new information had been provided to suggest that ICWA applied to the children.

On December 14, 2018, the children were placed with the paternal grandmother in Nevada. The children were thriving and doing well in the paternal grandmother's home. The paternal grandmother was nurturing and loving towards the children and their emotional and physical needs were being met.

On February 8, 2019, the juvenile court found that ICWA did not apply, terminated Mother's reunification services, reduced the parents' visitation to once per month, and set a section 366.26 hearing.

In its section 366.26 hearing report, DPSS noted that during "this reporting period, no new information has been provided to suggest that ICWA applies to the children." The children continued to thrive in their placement with the paternal grandmother. The paternal grandmother was nurturing toward the children, attended to all their needs, and the children appeared to be bonded to her. The paternal grandmother desired to adopt the children. Father J.T. had not visited the children, but called them "sporadically." Since

11

being placed in Nevada, Mother had called to talk to the children "sporadically every three to four weeks."

On September 5, 2019, Mother filed section 388 petitions, seeking return of the children to her care on family maintenance services. Mother alleged that she had completed her case plan, maintained visitation, and shared a strong bond with the children.

On September 6, 2019, DPSS reported that Mother was sentenced to state prison for a term of three years and that her release date was scheduled for March 2021. DPSS also noted that the children were doing well and were stable in their placement with the paternal grandmother who desired to adopt them.

The combined section 388 and section 366.26 hearings were held on September 6, 2019. Mother was present in custody. DPSS submitted on its reports and all counsel stipulated that Mother's stipulated testimony could apply for both hearings. The juvenile court denied Mother's section 388 petitions for failing to state either changed circumstances or best interest of the children. The court also terminated parental rights and found the children adoptable.

On September 30, 2019, Mother filed a timely notice of appeal, challenging the orders made at the September 6, 2019 hearings.

III

DISCUSSION

A.     *Compliance with ICWA*

Mother contends the order terminating parental rights must be reversed because DPSS did not comply with the inquiry and notice requirements of ICWA, resulting in incomplete ICWA notices being sent.[4]  We disagree.

1.     *Standard of Review*

"The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.  [Citation.]"  (*In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57.)  When, as is the case here, the facts are undisputed, we review independently whether the requirements of ICWA have been satisfied.  (*In re J.L.* (2017) 10 Cal.App.5th 913, 918 (*J.L.*).)  However, we review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order.  (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467; *In re H.B.* (2008) 161 Cal.App.4th 115, 119-120.)  We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.  (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446.)

---

[4] The juvenile court's order terminating Mother's parental rights did not specifically mention ICWA, but the order was "necessarily premised on a current finding by the juvenile court that it had no reason to know [the children] [were] [] Indian child[ren] and thus ICWA notice was not required."  (*In re Isaiah W.* (2016) 1 Cal.5th 1, 10, italics omitted (*Isaiah W.*).)

13

2.	*Relevant Law*

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (*Isaiah W.*, *supra*, 1 Cal.5th at pp. 7-8.) "ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian child from his or her family. [Citations.] For purposes of ICWA, an 'Indian child' is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. [Citations.]" (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 783 (*Elizabeth M.*).)

There are two separate ICWA requirements which are sometimes conflated: the obligation to give notice to a tribe, and the obligation to conduct further inquiry to determine whether notice is necessary. Notice to a tribe is required, under federal and state law, when the court knows or has reason to know the child *is* an Indian child. (*Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 784.) In contrast, prior to January 2019, the department was to make further inquiry if it "knows or has reason to know that an Indian child is or *may be* involved" in the case. (Cal. Rules of Court, rule 5.481(a)(4), italics added.)

The "'courts and county welfare departments "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . is to be, or has been, filed is or may be an Indian child in all dependency proceedings . . . if the child is at risk of entering foster care or is in foster care."'" [Citation.]" (*J.L.*, *supra*, 10 Cal.App.5th at p. 918, italics omitted.) "This notice requirement, which is also codified in California law [citation], enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 5.)

Although the notice requirement has always been triggered by a court having "'"reason to know"'" a child may be an Indian child, for many years the term was undefined under federal law. (See *In re Breanna S.* (2017) 8 Cal.App.5th 636, 650.) It was not until 2016 that the Department of the Interior promulgated regulations defining "'"reason to know."'" (Indian Child Welfare Act Proceedings, 81 Fed.Reg. 38778, 38803.)

Under the federal regulations, there is "reason to know" a child is an Indian child if "(1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child; [¶] (2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child; [¶] (3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child; [¶] (4) The court is informed that the domicile or residence of the child, the child's

15

parent, or the child's Indian custodian is on a reservation or in an Alaska Native village; [¶] (5) The court is informed that the child is or has been a ward of a Tribal court; or [¶] (6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe."  (25 C.F.R. § 23.107(c).)

State law, however, defined "reason to know" in 2006.  (Senate Bill No. 678, Stats. 2006, ch. 838, §§ 31, 32 (2005-2006 Reg. Sess.); former § 224.3, subd. (b).)  From 2006 until 2018, when Assembly Bill No. 3176 (2017-2018 Reg. Sess.) amended the definition, a court or agency had "reason to know" a child may be an Indian child if, for instance, a "person having an interest in the child . . . provide[d] information *suggesting* the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe."  (Former § 224.3, subd. (b)(1), italics added; see *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539 ["If . . . circumstances indicate a child may be an Indian child, the social worker must further inquire regarding the child's possible Indian status. Further inquiry includes interviewing the parents, . . . extended family members or any other person who can reasonably be expected to have information concerning the child's membership status or eligibility.  [Citation.]"]; see also Cal. Rules of Court, rule 5.481(a)(4) ["If the social worker . . . or petitioner knows or has reason to know that an Indian child is or may be involved, that person or entity must make further inquiry as soon as practicable."].)  As cases at the time noted, the former provision did not demand much before requiring ICWA notice.  (See *Dwayne P. v. Superior Court* (2002) 103

16

Cal.App.4th 247, 258 [mere "minimal showing required to trigger the statutory notice provisions"].)

But now, as amended by Assembly Bill No. 3176, which became effective on January 1, 2019, the Welfare and Institutions Code's definition of "reason to know" conforms to the definition provided by federal regulations. (§ 224.2, subd. (d); see Assem. Com. on Human Services, Analysis of Assem. Bill No. 3176 (2017-2018 Reg. Sess.) Aug. 28, 2018, p. 8 [the bill "'simply seeks to change California law to comply with Federal regulations'"].) Under section 224.2, subdivision (d)(1) through (d)(6), the six criteria to determine the definition of "reason to know" are the same as those under the federal regulations. (See § 224.2, subd. (d) & 25 C.F.R. § 23.107(c).)

In addition, section 224.2, subdivisions (a) through (c), currently provide as follows: "(a) The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 may be or has been filed, is or may be an Indian child. The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child. [¶] (b) If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307, the county welfare department or county probation department has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members,

17

others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.  [¶]  (c) At the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child.  The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."

Section 224.2, subdivision (e), states, "If the court, social worker, or probation officer has *reason to believe* that an Indian child is involved in a proceeding, the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child . . . ."  The provision goes on to state that further inquiry includes "[i]nterviewing the . . . extended family members" to gather additional information as well as "[c]ontacting . . . any other person that may reasonably be expected to have information regarding the child's membership status or eligibility." (§ 224.2, subds. (e)(1)-(2), italics added.)

"If the notice duty is triggered under ICWA, the notice to a tribe must include a wide range of information about relatives, including grandparents and great-grandparents, to enable the tribe to properly identify the children's Indian ancestry.  [Citation.]  Any violation of this policy requires the appellate court to vacate the offending order and remand the matter for further proceedings consistent with ICWA requirements. [Citation.]"  (*In re J.D.* (2010) 189 Cal.App.4th 118, 124 (*J.D.*).)  Federal regulations

require that ICWA notices include, "[i]f known, the names, birthdates, birthplaces, and Tribal enrollment information" of parents and "other direct lineal ancestors of the child, such as grandparents." (25 C.F.R. § 23.111(d)(3).) The Welfare and Institutions Code provisions applying ICWA contain similar requirements. Although those provisions were amended, they at all relevant times required that an ICWA notice contain "[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(C); see former § 224.2, subd. (a)(5)(C).)

ICWA provides that a state may provide "a higher standard of protection to the rights of the parent" than the rights provided under ICWA. (25 U.S.C. § 1921.) A court must apply the higher standard whenever it applies. (*Ibid*.; see § 224, subd. (d).) A violation of any "higher state standard, above and beyond what the ICWA itself requires," however, "must be held harmless unless the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error." (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1162 (*S.B.*); see *Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 784 [finding error harmless where facts provided "no basis to believe that providing" a parent's correct birth year "would have produced different results concerning the minor's Indian heritage"].)

19

3.       *Whether Former or Current ICWA Statutes Apply*

In this case, DPSS sent ICWA-030 notices to the BIA in December 2017.  At the six-month review hearing on August 15, 2018, and 12-month review hearing on February 8, 2019, the juvenile court found that ICWA did not apply.  At the 12-month review hearing, the court terminated Mother's reunification services and set a section 366.26 hearing.  In finding ICWA did not apply, the court stated that proper notice had been given as required by law, a "sufficient inquiry" had been made, and there was "no information to show that ICWA may now apply."  Mother did not challenge the order from the 12-month review hearing by filing a writ petition.

In December 2017, July 2018, and February 2019, the social worker continued to inquire of Mother as to her Indian ancestry.  Mother initially reported in her ICWA-020 form that the maternal grandfather had Indian ancestry but did not know the tribe's name.  Later, on December 21, 2017, Mother stated that she was told she had "Blackfoot and Cherokee tribe affiliation but was not registered, however, [she] planned to register with them on the day of contact."  On July 10, 2018, Mother reported that "she may have Blackfoot Tribe ancestry.  However, she is not registered."  During the dependency proceedings, Mother had no additional or new information to provide as to her Indian ancestry.  In addition, Mother's biological parents were deceased and DPSS was unable to locate relatives with the exception of Mother's former foster sibling.  On September 6, 2019, at the section 366.26 hearing, the juvenile court implicitly found that ICWA did not

apply. Mother subsequently appealed, challenging DPSS's investigatory and noticing efforts.

DPSS argues that under *Isaiah W.*, the current ICWA statutes apply because the notice of appeal was filed from the September 6, 2019 order terminating parental rights. Mother responds that the statutes in effect at the time DPSS sent the defective notices to the BIA in December 2017 apply. She also asserts that retroactive application of amended section 224.2 is inappropriate because *Isaiah W.* does not support DPSS's theory and that "[c]ases are not authority for propositions not considered." We find DPSS's arguments more persuasive as retroactivity is not at issue under the circumstances. In this regard, *Isaiah W.*, *supra*, 1 Cal.5th 1 is instructive.

In *Isaiah W.*, *supra*, 1 Cal.5th 1, the juvenile court found ICWA did not apply at the jurisdictional/dispositional hearing. The mother did not appeal from that order or otherwise object to the court's ICWA finding. (*Id*. at p. 6.) Nearly one year later, the court terminated the mother's parental rights and again found ICWA did not apply. The mother appealed the court's order terminating her parental rights on the ground that the court had reason to know the minor was an Indian child but failed to order the department to comply with the ICWA notice requirements. (*Id*. at pp. 6-7.) The Court of Appeal denied relief, finding the mother forfeited her right to appeal from the section 366.26 order due to her failure to appeal from the jurisdictional/dispositional order, which became final 60 days after pronouncement by the court. (*Isaiah W.*, at p. 7.)

21

Our Supreme Court reversed and remanded for further ICWA proceedings, finding the mother did not forfeit the ICWA issue by failing to appeal from the dispositional order because ICWA and the corresponding provisions of California law impose an affirmative and continuing duty on the juvenile court to inquire whether the child is an Indian child.  (*Isaiah W.*, *supra*, 1 Cal.5th at pp. 6, 9-12, 14-15.)  The court concluded: "In light of this continuing duty, the . . . order terminating [the mother's] parental rights was necessarily premised on a *current* finding by the juvenile court that it had no reason to know Isaiah was an Indian child and thus ICWA notice was not required.  Here, the juvenile court made that finding explicit in the course of the [section 366.26] hearing when it said, 'the Court is once again making a finding [that] I have no reason to know the child would fall under the [ICWA].'  Properly understood, [the mother's] present appeal does not seek to challenge the juvenile court's finding of ICWA's inapplicability underlying the . . . dispositional order.  It instead seeks to challenge the juvenile court's finding of ICWA's inapplicability underlying the . . . order terminating her parental rights." (*Id*. at p. 10.)

The Supreme Court explained:  "The plain language of [former section 224.3, subdivision (a)]—declaring an 'affirmative and continuing duty' that applies to 'all dependency proceedings' [citation]—means that the juvenile court in this case had a present duty to inquire whether Isaiah was an Indian child at the April 2013 proceeding to terminate [the mother's] parental rights, even though the court had previously found no reason to know Isaiah was an Indian child at the January 2012 proceeding to place Isaiah

22

in foster care.  Because the validity of the April 2013 order is necessarily premised on the juvenile court's fulfillment of that duty, there is nothing improper or untimely about [the mother's] contention in this appeal that the juvenile court erred in discharging that duty." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 11, italics omitted.)  The court found that the mother's "present appeal does not seek to challenge the juvenile court's finding of ICWA's inapplicability underlying the January 2012 dispositional order.  It instead seeks to challenge the juvenile court's finding of ICWA's inapplicability underlying the April 2013 order terminating her parental rights." (*Id.* at p. 10.)  The court concluded that the "juvenile court's determination of ICWA's inapplicability at the January 2012 hearing had no effect on its ongoing inquiry and notice obligations" (*id*. at p. 12) and that "[t]he court's April 2013 termination order necessarily subsumed a present determination of ICWA's inapplicability." (*Id*. at p. 15.)

While the facts of *Isaiah W.* differ from those in this case in some respects, it is nonetheless instructive.  Here, the juvenile court explicitly found that ICWA did not apply at the six-month review hearing held on August 15, 2018.  At that hearing, the court continued Mother's reunification services.  The juvenile court also explicitly found that ICWA did not apply at the contested 12-month review hearing on February 8, 2019.  By February 2019, current ICWA statutes were in effect.  At that hearing, the court also terminated reunification services and set a section 366.26 hearing.  Mother did not file a writ petition from the six-month review order, assuming she could, nor did she object at the subsequent 12-month review hearing held in February 2019.  She also did not object

at the section 366.26 hearing held on September 6, 2019, when the court implicitly found DPSS complied with the ICWA notice and inquiry requirements and that ICWA did not apply. Like *Isaiah W.*, Mother's challenge is applicable to the juvenile court's finding of ICWA inapplicability underlying the September 6, 2019 order terminating her parental rights, not the February 15, 2018 jurisdictional/dispositional order or the August 15, 2018 six-month review order continuing her services. (*Isaiah W.*, *supra*, 1 Cal.5th at p. 15; *J.L.*, *supra*, 10 Cal.App.5th at p. 917, fn. 4.)

Therefore, similar to *Isaiah W.*, on September 6, 2019, the juvenile court had a duty to determine whether the children were Indian children based on the circumstances existing on September 6, 2019, and not based on the facts or law that existed in December 2017 when the ICWA notices were sent. The determinative factor is not when the ICWA-030 notices were mailed to the relevant tribes, but when the section 366.26 hearing was held. The juvenile court's 2019 termination order "necessarily subsumed a present determination" of ICWA's applicability. (*Isaiah W. supra*, 1 Cal.5th at p. 15.)

Mother relies on *In re A.W.* (2019) 38 Cal.App.5th 655, which was decided in 2019 and applied the statute in effect at the time of the defective notice. The court there rejected an argument that the revised language of section 224.2 requires notice "only when the court knows or has reason to know the child is definitively a member (or knows a parent is definitively a member and the child is eligible for membership)" in an Indian tribe. (*A.W.*, at p. 665, italics omitted.) The court in *A.W.* did not conduct its analysis under the revised statutes. (*Id.* at p. 662, fn. 3.) However, the *A.W.* court assumed the

California law in effect at the time the juvenile court had conducted the ICWA compliance hearing at issue in 2016 applied and did not conduct an analysis under *Isaiah W.* (*A.W.*, at p. 662, fn. 3.)

The issue before us then is whether the juvenile court and DPSS complied with the inquiry and notice provisions of the current ICWA statutes. We agree with DPSS that the present statute is not being applied retroactively because the juvenile court has a continuing duty to determine whether ICWA applies. Since Mother is appealing from the findings made at the September 6, 2019 section 366.26 hearing and not those in 2017 or 2018, the current ICWA statutes apply.

4. *Duty of Inquiry and Duty to Notice Under Current ICWA Statutes*

Mother argues DPSS failed to comply with the ICWA notice requirements because it omitted Mother's grandfather's (the children's great-grandfather) name, C.M., on the ICWA-030 notices. She also faults DPSS in failing to send ICWA notices to the Blackfeet and Cherokee tribes after Mother informed the social worker that "she believed she had Blackfoot and Cherokee heritage."

As previously noted, the agency is required to provide notice if it knows or has "reason to know" the child is an Indian child. (25 U.S.C. § 1912, subd. (a); § 224.2, subd. (f).) Here, the information available to DPSS and the juvenile court did not meet the "reason to know" criteria set forth in the federal regulations and the California statutes related to ICWA. (See 25 U.S.C. § 1912, subd. (c); § 224.2, subd. (d).) No one had informed the court or DPSS that the children were Indian children, the children had

25

not given the court reason to know they were Indian children, there was no suggestion the children had ever lived on a reservation or had been wards of a tribal court, and there was no indication that the children or their parents possessed a tribal identification card. (See 25 C.F.R. § 23.107, subds. (c)(1), (3)-(6); § 224.2, subd. (d)(1), (3)-(6).) At most, Mother had provided information indicating she may have Indian heritage. Although it would follow that the children might also have some Indian heritage, the information Mother provided to DPSS did not rise to the level of "information indicating that the child[ren] [are] [] Indian child[ren]." (See 25 C.F.R. § 23.107(c)(2), (3); § 224.2, subd. (d)(2), (3).)

Mother argues "the list of 'reasons to know' should not be read in a restrictive fashion" and that "[i]n conformity with prior case law, when, as here, the parent lists a grandfather's name as a member of an Indian tribe [citation] and subsequently provides the names of the Blackfoot and Cherokee tribes [citation], that is more than enough to establish a 'reason to know' the child may be eligible for membership in those tribes [citation], triggering the notice requirement." We disagree. Prior case law pre-dates the 2016 enactment of the new federal regulations defining "reason to know" and the 2019 amendments to the California statutes distinguishing between "reason to know" and "reason to believe." (See *In re D.C.* (2015) 243 Cal.App.4th 41, 62; *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1387-1388 (*Kadence P.*); *In re B.H.* (2015) 241 Cal.App.4th 603, 606-607 (*B.H.*); see 81 Fed.Reg. 38804, 38805 (June 14, 2016) [distinguishing between "reason to know" and "reason to believe" and indicating state courts may require additional investigation].)

26

In any event, even before the regulations and statutory amendments clarifying the meaning of "reason to know," courts had found that vague information or "'family lore'" indicating a child "'may'" have Indian ancestry insufficient to require notice. (See *J.L.*, *supra*, 10 Cal.App.5th at pp. 921-923; *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1516 [bare suggestion that child might be an Indian child insufficient to trigger notice]; *In re Michael V.* (2016) 3 Cal.App.5th 225, 234 [statements indicating Indian heritage made by relative require further inquiry but not notice]; cf. *Kadence P.*, *supra*, 241 Cal.App.4th at pp. 1387-1388 [photos and articulated basis of belief made claim of Indian ancestry more than family lore].) Here, the only specific information Mother provided was a statement that she was told and believed that she may have Indian ancestry with the Blackfeet and Cherokee tribes but was not registered. She also listed her grandfather, C.M., as having possible Indian heritage but never provided additional information concerning her Indian ancestry. We are not persuaded that Mother's statements, alone, were sufficient to trigger the ICWA notice provisions.

That said, the information Mother provided was sufficient to require further inquiry, as the juvenile court ordered. Likewise, the information gave the juvenile court and DPSS reason to believe that an Indian child was involved and, thus, the additional inquiry should have, at minimum, included interviews with Mother's extended family members. (§ 224.2, subd. (b), (e); see *In re N.G.* (2018) 27 Cal.App.5th 474, 482 [social worker required to make further inquiry based on minimal parental disclosures, including inquiry to maternal uncle]; *In re Alice M.* (2008) 161 Cal.App.4th 1189, 1200 [finding the

duty to inquire requires less certainty regarding the child's Indian status than the duty to notice].)

Nonetheless, in this case DPSS could not have obtained any further information from any other maternal relatives. Both maternal grandparents were deceased. In addition, Mother was raised in foster care due to her biological parents not being involved in her life and had no contact with any relatives. She was placed in legal guardianship at the age of 18 months until she was 11 years old. She then was placed in group homes until she was emancipated. Mother's support system consisted of her significant other and her former foster family. In addition, she did not provide DPSS with information as to any maternal relative for Indian ancestry or placement for the children. No maternal relative appeared at any hearing or participated in this matter.

ICWA does not obligate the court or DPSS "to cast about" for investigative leads. (*In re Levi U.* (2000) 78 Cal.App.4th 191, 199.) There is no need for further inquiry if no one has offered information that would give the court or DPSS reason to believe that a child might be an Indian child. This includes circumstances where parents "fail[ ] to provide any information requiring followup" (*S.B.*, *supra*, 130 Cal.App.4th at p. 1161; see *B.H.*, *supra*, 241 Cal.App.4th at p. 608; *In re C.Y.* (2012) 208 Cal.App.4th 34, 42), or if the persons who might have additional information are deceased (*J.D.*, *supra*, 189 Cal.App.4th at p. 124), or refuse to talk to DPSS. (*In re K.M.* (2009) 172 Cal.App.4th 115, 119.)

Here, DPSS's inquiry was appropriate and complied with section 224.2. Mother has not demonstrated there was a viable lead that would require DPSS "to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.) Since both of Mother's biological parents were deceased and Mother had no information concerning any other relatives, DPSS could not contact Mother's parents or any other relatives to obtain additional ICWA information. In addition, DPSS requested additional ICWA information from Mother. However, Mother was unable to provide new or additional information concerning ICWA. Mother has not demonstrated error, and reversal is not warranted under the circumstances of this case.

B.    *Compliance with the UCCJEA*

Mother also argues that all orders on this matter must be reversed because the juvenile court failed to comply with the UCCJEA. Specifically, she argues that California did not have subject matter jurisdiction on the date DPSS filed its petition on December 5, 2017, because California was not the children's "'home state'" and neither Nevada nor Arizona[5] had declined jurisdiction or been contacted. We disagree.

The UCCJEA (Family Code, § 3400 et seq.) is a uniform act drafted by the National Conference of Commissioners on Uniform State Laws that has been adopted in nearly all 50 states. It was adopted in California effective January 1, 2000. (*In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1096 (*Christian I.*).) The UCCJEA provides

_____

[5] The record indicates that Father J.T. had lived in Arizona and Nevada and that Mother had lived with Father J.T. prior to moving back to California.

29

"the exclusive method for determining the proper forum to decide custody issues involving a child who is subject to a sister-state custody order.  [Citations.]"  (*Ibid*.; Fam. Code, § 3421, subds. (a), (b).)

There are several pertinent provisions within the UCCJEA.  First, Mother points to the definition of "home state," found in Family Code section 3402, subdivision (g), which provides, in pertinent part:  "'Home state' means the state in which a child lived with a parent or a person acting as a parent for *at least six consecutive months immediately before* the commencement of a child custody proceeding. . . .  A period of temporary absence of any of the mentioned persons is part of the period."  (Italics added.)

Family Code section 3421, subdivision (a), sets forth the circumstances under which a California court is generally permitted to make an initial child custody determination.  It provides, in pertinent part:  "(a) Except as otherwise provided in [Family Code] [s]ection 3424, a court of this state has jurisdiction to make an initial child custody determination only if any of the following are true:

"(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

"(2) A court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the grounds

30

that this state is the more appropriate forum under [Family Code] [s]ection 3427 or 3428, and both of the following are true:

"(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

"(B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships. [¶] . . . [¶]

"(4) No court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3)."

Family Code section 3424 provides an exception for emergency situations, such as mistreatment or abuse of a child. Pursuant to Family Code section 3424, subdivision (a), a court of this state has temporary emergency jurisdiction "if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child . . . is subjected to, or threatened with, mistreatment or abuse." Although temporary jurisdiction is intended to be short term, "'the juvenile court may continue to exercise its authority as long as the reasons underlying the dependency exist.' [Citations.]" (*Cristian I.*, *supra*, 224 Cal.App.4th at p. 1097.) However, if a court of this state has been asked to make a custody determination pursuant to the emergency provision, "upon being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of a state having jurisdiction

31

under [Family Code] [s]ections 3421 to 3423, inclusive," it must "immediately communicate with the other court." (Fam. Code, § 3424, subd. (d).)

A juvenile court's determination as to its authority to exercise jurisdiction under the UCCJEA may be raised on appeal for the first time. (*In re Gloria A.* (2013) 213 Cal.App.4th 476, 481.) We review the facts establishing jurisdiction for substantial evidence. (*In re Aiden L.* (2017) 16 Cal.App.5th 508, 520.) The interpretation of the UCCJEA is a question of law we review de novo. (*Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1287.)

Subject matter jurisdiction either exists or does not exist at the time an action is commenced. It "cannot be conferred by stipulation, consent, waiver or estoppel." (*In re Jaheim B.* (2008) 169 Cal.App.4th 1343, 1348.) We find the juvenile court properly asserted jurisdiction over the children.

Family Code section 3421, subdivision (a), gives a California court jurisdiction to make an initial custody determination. Analysis of this section requires reference to Family Code section 3402, subdivision (g), which defines the term "[h]ome state," as a state where a child lived with a parent, or a person acting as a parent, for at least six consecutive months immediately before commencement of a child custody proceeding. (Fam. Code, § 3402, subd. (g).) Here, Father J.T. reported that the children were with his mother for more than one year and with him for approximately five months in Las Vegas earlier in 2017. Mother thereafter came to visit and took both children to California. There is no evidence of exactly when Mother took the children to California. A relative

32

informed the social worker that "the last time they have had contact with the children was during the summer of 2017." In addition, Father stated that he had the children for five months in early 2017. This information is sufficient to show Mother had custody of the children "for at least six consecutive months immediately before commencement of a child custody proceeding." (Fam. Code, § 3402, subd. (g).)

Furthermore, the children and Mother had significant connections with the state beyond mere presence. Mother had been raised in California and her foster siblings resided in California. In addition, Father and a relative stated that when Mother took the children "back" to California during the summer of 2017, she and the children resided in Indio, California. A.M. was born in California, and Father J.T. believed A.M. was enrolled in an elementary school in Barstow, California. A.M. informed the social worker that they lived with friends, and that he attended third grade at an elementary school in Beaumont, California. Because the requirements of Family Code section 3421 were met, the juvenile court had jurisdiction to make an initial child custody determination pursuant to this section.

Even if it did not have jurisdiction pursuant to Family Code section 3421, the juvenile court had temporary emergency jurisdiction under Family Code section 3424. Temporary emergency jurisdiction is available to a California court if the child is present in this state and it is necessary to protect the child from mistreatment or abuse. (Fam. Code, § 3424, subd. (a).) This provision is to be interpreted expansively. (Fam. Code,

§ 3424, subd. (e).)  Mother does not argue that the circumstances present here do not qualify for emergency jurisdiction.

Mother correctly points out that when a juvenile court exercises emergency jurisdiction, "upon being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of a state having jurisdiction under [Family Code] [s]ections 3421 to 3423, inclusive, [it] shall immediately communicate with the other court."  (Fam. Code, § 3424, subd. (d).)  While there was some suggestion that a family law or child custody proceeding had commenced in either Nevada or Arizona, DPSS did not obtain any information about any such proceeding and specified that there were no family law orders in place.

Although Mother initially stated that there was a family law case open in Nevada, she later clarified that there was not a pending family law proceeding.  On December 26, 2017, Mother reported "she [was] unaware of whether or not there are family law orders in place for her son," J.T.  On July 12, 2018, Mother further explained that she had initially completed and submitted family law orders regarding J.T., because Father J.T. was attempting to keep J.T. from her, but that she did not follow through with filing the papers to obtain family law orders.

Furthermore, Father J.T., who would necessarily be a party to any such action, was unaware of any family law or child custody proceedings in either Nevada or Arizona.  On December 21, 2017, Father J.T. reported that he had completed and submitted family law orders regarding J.T., after Mother took J.T. during the summer of 2017.  Father J.T. later

34

clarified that because Mother's whereabouts were unknown to him, he was unable to successfully serve her with the documents. He denied refiling the paperwork, due to Mother moving to Barstow and her allowing him to see the children. Law enforcement also informed Father J.T. that he had no grounds to claim Mother kidnapped the children "since there was no court order from family law."

There is no evidence that Mother was served with documents regarding child custody proceedings, as she claims. Mother reported receiving some documents in the mail a few days before her birthday in 2016, but stated the documents told her she did not have to appear in court. She believed Father J.T. "did not appear either and child support was established at that hearing." Even if an order for child support was established at that hearing, there is no evidence that child custody orders were made at that hearing. Both parents stated that no such child custody order existed. Law enforcement also noted that no family law orders were in effect as of the summer of 2017.

In the absence of actual judicial records from either Nevada or Arizona, or official notice to Father J.T. or notice to Mother, the juvenile court was entitled to discredit the parents' vague references to family law proceedings in either Nevada or Arizona. Mother has not made an offer of proof or affirmative assertion on appeal regarding the existence of a relevant Nevada or Arizona proceeding. We therefore find, to the extent that the juvenile court impliedly discredited the verbal, hearsay claim of a proceeding in Nevada or Arizona, the evidence supports an implied factual finding that no such proceeding took place. The court's temporary emergency jurisdiction can ripen into continuing

35

jurisdiction where, as here, no other state with grounds for continuing jurisdiction exists. (*In re Gino C.* (2014) 224 Cal.App.4th 959, 967 (*Gino C.*).)

In sum, the juvenile court had subject matter jurisdiction, and the orders need not be vacated for lack of jurisdiction.

Moreover, any error in failing to comply with the UCCJEA was harmless. "Failure to comply with the procedural requirements of the UCCJEA is subject to harmless error analysis. [Citations.]" (*Cristian I.*, *supra*, 224 Cal.App.4th at p. 1098.) Under a harmless error analysis, no judgment can be reversed for ordinary error unless the error complained of "has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Reversal is justified "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *Cristian I.*, at pp. 1098-1099.)

We find Mother's contention that the juvenile court erred in failing to comply with the requirements of the UCCJEA harmless. Mother has not shown that she was prejudiced either by the juvenile court's failure to address UCCJEA, or to contact Nevada or Arizona authorities. First, we have determined that California had jurisdiction pursuant to Family Code section 3421. Because it had such jurisdiction, the court's failure to directly address the UCCJEA issue was harmless. Neither Nevada nor Arizona qualified as the children's home state, thus the juvenile court did not need to contact the

Nevada or Arizona court. Mother has not shown that, had the juvenile court specifically addressed the UCCJEA, the juvenile court would have come to the conclusion that it did not have jurisdiction, that it was required to contact Nevada or Arizona, or that it was required to cede jurisdiction to Nevada or Arizona.

Even if the juvenile court's jurisdiction were merely emergency jurisdiction, the juvenile court was entitled to disregard the vague, verbal reference to a child custody proceeding in Nevada or Arizona. In the absence of more concrete evidence of such a proceeding, the juvenile court was not required to "communicate with the other court" as set forth in Family Code section 3424, subdivision (d). (See, e.g., *In re R.L.* (2016) 4 Cal.App.5th 125, 145 [harmless error for the juvenile court not to contact a Mexican court, where the juvenile court properly asserted temporary emergency jurisdiction, and no child custody action was filed in Mexico].) We note that in the absence of a court order or other official court document, the juvenile court would not know what court to contact. Mother had ample opportunity to provide such evidence in this proceeding, and has failed to do so.

Mother cites several cases in which a juvenile court's failure to comply with the requirements of the UCCJEA have been considered reversible error. These cases are factually distinguishable.

In *Gino C.*, Mexico was the children's home state because the children had lived there for six consecutive months immediately preceding the filing of the case. (*Gino C.*, *supra*, 224 Cal.App.4th at pp. 964-965.) The juvenile court declined to contact Mexico, despite its knowledge that Mexico was the children's home state. Thus, the juvenile court did not have jurisdiction under Family Code section 3421, subdivision (a). While it had temporary emergency jurisdiction, the juvenile court's orders could not become final unless Mexico affirmatively declined to exercise its home state jurisdiction. (*Gino C.*, at p. 966.) The judgment was therefore reversed, and remanded for further proceedings. (*Id.* at p. 968.) Here, unlike in *Gino C.*, there is insufficient evidence to show either Nevada or Arizona was the children's home state.

Similarly, in *In re A.M.* (2014) 224 Cal.App.4th 593, the father and children lived in Tijuana for at least six months before child protective services in California filed a petition on the children's behalf. The children were detained when their mother was arrested as she attempted to smuggle drugs across the border with the children in the car. (*Id.* at p. 596.) While the juvenile court properly assumed temporary emergency jurisdiction, the matter was remanded to provide notice to Mexican authorities and inquire whether Mexico wished to commence proceedings to protect the children. (*Id.* at pp. 599-600.) Again, the matter is distinguishable because Mexico was unquestionably the children's home state.

Based on the foregoing, the juvenile court properly exercised subject matter jurisdiction.

## IV

## DISPOSITION

The judgment is affirmed.

CODRINGTON  
Acting P. J.

We concur:

FIELDS  
J.

RAPHAEL  
J.

39

Filed 4/2/20

**CERTIFIED FOR PARTIAL PUBLICATION\***


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | |
| | E073805 |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. A.M., Defendant and Appellant. | (Super.Ct.No. RIJ1700999) ORDER CERTIFYING OPINION FOR PUBLICATION |


The court has reviewed a request filed March 17, 2020, to publish the nonpublished opinion filed in the above matter March 5, 2020. The request is GRANTED. The opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c)(4), (6), and (7).

IT IS SO ORDERED that said opinion be certified for partial publication pursuant to California Rules of Court, rule 8.1105(b).

<u>CODRINGTON</u>
Acting P. J.

We concur:

<u>FIELDS</u>
J.

<u>RAPHAEL</u>
J.

---

**\*** Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.B.


1